THOMSEN and others, Respondents, vs. CULLEN, Receiver, and others, Appellants: FIRST WISCONSIN TRUST COMPANY, as Trustee, and others, Respondents.

*April 7—October 9, 1928.*

582

*H. K. Curtis* and *Joseph G. Hirschberg,* both of Milwaukee, for the appellant receiver.

*Norman L. Baker,* attorney, and *F. E. McGovern,* of counsel, both of Milwaukee, for the appellants McGovern.

*William J. Morgan* of Milwaukee, for the respondent Wisconsin Mortgage & Securities Company.

*Quarles, Spence & Quarles,* attorneys, and *J. V. Quarles,* of counsel, all of Milwaukee, for the First Wisconsin Trust Company as trustee.

The following opinion was filed May 8, 1928:

ROSENBERRY, J.   The case presented here includes over a thousand pages of printed matter.   There are nearly four hundred pages of briefs.   We regard the amount of printing presented in this case in this court as entirely unjustifiable and being an unwarranted expense to parties.   It is not in accordance with the rule and we feel that it should not be passed without comment.

In view of the decision reached, we are not called upon to consider the matter so far as it relates to the taxation of costs.

There are three principal questions raised in this case:

I. Did the trial court err in refusing to subordinate the rights of the first mortgagee to the entire expense of the receivership?   This question arises upon the appeal of the receiver.

II. Did the court err in allowing interest upon the first mortgage?

III. Did the court err in awarding to the first mortgagee as real estate certain specified equipment consisting principally of flasks, stores and supplies?

Questions II and III arise upon the appeal of the executor and executrix of the will of P. H. McGovern, second mortgagee.

The First Wisconsin Trust Company was trustee under a first real-estate mortgage recorded November 13, 1922, to secure an issue of bonds of the face value of $100,000 held and owned by the Wisconsin Mortgage and Securities Company, successor to the Bankers Finance Corporation.   There

was a second mortgage upon the real estate and personal property of the Casting Company to P. H. McGovern to secure $25,000. This mortgage was recorded as a real-estate mortgage on February 16, 1923, and filed as a chattel mortgage February 16, 1923. There were three junior mortgages securing indebtedness aggregating $16,248. The court found that from and after April 1, 1923, there was due to the First Wisconsin Trust Company, trustee, on bonds and mortgage the amount of $100,000, together with interest at seven per cent. per annum from the 1st day of April, 1923, and interest at seven per cent. on the interest on which default had been made. On December 31, 1926, there was due on account of interest $13,553 and on account of interest on defaulted interest instalments according to the terms of the trust mortgage $2,290.86, making in all $115,843.86. The second mortgage by its terms declared that it was subject to a mortgage for $100,000, dated October 2, 1922, recorded November 13, 1922. The property was sold by agreement of all the parties in interest free and clear of all liens and incumbrances upon stipulation "that upon the sale of said property all valid liens and incumbrances upon such property, or any part thereof, and rights of preference and priority should be transferred to, impressed with, and attached to the proceeds of such sale in the respective order of preference and priority existing prior to such sale."

Upon the sale the real estate, including the disputed equipment items, brought $127,500, to which was added later some interest upon deferred payments. The court found as conclusions of law that upon the sale of the real property and disputed equipment to Pawling & Harnischfeger Company, a sum amounting to $123,740 was the proceeds of real estate subject to the first trust mortgage to the First Wisconsin Trust Company as trustee and should be distributed as such; that a remainder of $3,760 realized on the sale to Pawling & Harnischfeger Company was the proceeds of

the sale of personal property subject to the P. H. McGovern mortgage and should be distributed as such. The situation can be most briefly and concisely presented by the following analysis of the receiver's report:

### Receipts.

The total receipts of the receiver, either paid to him or deposited with the clerk of the court, are ........................... $159,702 10

These receipts are set forth in detail in the receiver's reports hereinbefore referred to and such receipts may be grouped for convenience as follows:

| | | |
|---|---:|---:|
| a. Proceeds of sale of property to Pawling & Harnischfeger Company, including interest ........ | $128,252 | 50 |
| b. Cash ................. | 3,733 | 99 |
| c. Rent .................. | 258 | 00 |
| d. Collected stock subscriptions ................ | 797 | 55 |
| e. Merchandise sold........ | 20,080 | 69 |
| f. Interest received ........ | 92 | 47 |
| g. Watchman's wages, insurance and taxes paid by Pawling & Harnischfeger Company ............ | 797 | 04 |
| h. Misc. receipts .......... | 947 | 03 |
| i. Receiver's certificates sold | 4,742 | 83 |
| Total receipts ....... | $159,702 | 10 |

### Disbursements.

The total expenses incurred by the receiver during his administration of the insolvent's estate, including sums paid and those not paid, but incurred, are (exclusive of $4,000 invested in certificate of deposit) ......................... $61,532 78

These disbursements are set forth in detail in the receiver's reports hereinbefore referred to and such disbursements may be grouped for convenience as follows:

| | | |
|---|---:|---:|
| a. Accrued pay roll.......... | $9,720 | 27 |
| b. Watchman ............. | 1,664 | 90 |
| c. Current pay roll and labor.. | 8,047 | 78 |
| d. Office expense—stenographer | 531 | 46 |
| e. Accounting to determine unpaid stock subscriptions... | 302 | 50 |
| f. Legal notices published or served ................ | 351 | 96 |
| g. Merchandise ............. | 3,225 | 39 |
| h. Freight and cartage.......:. | 262 | 84 |
| i. Disbursements in litigation.. | 1,504 | 03 |
| j. Misc. office expenses, telephone, telegraph, etc...... | 791 | 90 |
| k. Insurance ............... | 1,760 | 82 |
| l. Rogers' auditing accounting | 2,218 | 77 |
| m. Paid taxes, internal revenue, etc. ................... | 5,972 | 92 |
| n. Premium on receiver's bond | 200 | 00 |
| o. Paid instalments on truck.... | 296 | 00 |
| p. Paid interest ............ | 33 | 00 |
| q. Advertising property ordered by court............... | 909 | 57 |
| r. Operating expenses, electric light, water, and repairs.. | 2,266 | 30 |
| s. Receiver's compensation.... | 6,304 | 50 |
| t. Services of receiver's attorneys ............... | 10,424 | 94 |
| u. Receiver's ctfs. issued by receiver ............... | 4,742 | 83 |
| Total disbursements.... | $61,532 | 78 |
| Total difference between total receipts and total disbursements ................ | $98,169 | 32 |

According to the contention of the receiver there would be available for distribution to the mortgagees $102,169.32 instead of $118,185.53 as found by the court. As against the first and second mortgage the court awarded priority of the receiver's expenses in the amount of $10,481.65 as follows:

| | |
|---|---:|
| Taxes | $5,852 07 |
| Cost of transcript | 616 50 |
| Receiver's services, $10 day | 260 75 |
| Disbursements for watchman | 1,190 08 |
| Traveling expenses | 20 44 |
| Cost of advertising sale | 909 57 |
| Counsel fees | 790 00 |
| Traveling expenses of counsel | 20 44 |
| Insurance on mortgaged property | 821 80 |
| | $10,481 65 |

A very able and exhaustive argument is made here to support the proposition that the court erred in not subordinating the first and second mortgages to the claims of the receiver for the expense of administration. Statute sections 268.16, 268.17, 286.11, and 286.40 are called to our attention. A claim is made that because the attorneys for the bondholders participated to some extent in the receivership proceedings, and particularly in view of the fact that one Smith was placed upon the board of directors of the Casting Company to represent as a director the interest of the bondholders, the first mortgages participated in the receivership proceeding, and thereby subjected the entire property to the jurisdiction of the court, and that under the statute and the decisions it was the duty of the court to first discharge the expenses of the receivership before applying any of the proceeds of the sale to the first and second mortgages. A great number of cases are cited to our attention. The evidence is analyzed and reviewed at considerable length. We have given consideration to all the matters

urged upon our attention. We shall not attempt to distinguish and classify cases or prepare a treatise upon the subject, but only to announce our conclusions and very briefly give our reasons therefor.

In the first place it is to be noted that the court charged so much of the expenses of the receivership as were for the benefit of first and second mortgagees against the fund out of which the mortgages were to be discharged, and in so doing it is considered that it proceeded correctly. It is only in a very limited class of cases that property subject to a prior lien can properly be subjected to the expenses of a receivership conducted principally in the interest of subsequent creditors and stockholders. The principal exception to the rule is that of a receiver operating the property of a public utility which is charged with the duty of furnishing services to the public. In cases of that character, such as receiverships of railways, light and power companies, etc., there are many considerations which justify the payment of expenses of operation out of the property even though it impairs the rights of a prior mortgagee. In the first place, the value of the property is largely contingent upon its continued operation and the whole proceeding is for the benefit of all parties concerned. In the second place, the public interest is such as to warrant a continuance of the operation of the plant, a fact which must be considered when money is loaned upon a security of that kind. No such consideration exists in the operation of a strictly private business. There the rights of parties are to be determined in accordance with sound legal principles. There could certainly be no just reason for permitting a receiver to speculate with the property of a mortgagee for the benefit of the stockholders and subsequent creditors. If the contentions of the receiver in this case are to be upheld, then a lienholder upon a manufacturing plant becomes in virtual effect a stockholder in the plant, subject to all the hazards of operation of the business by the court. Here the receivership proceedings were begun primarily in

the interest of subsequent creditors and stockholders. The property had been recently appraised for a good deal more than twice the amount of the liens against it. It was hoped and believed that something might be saved in addition to discharging the liens. The company was under contract to make certain deliveries which if the business was to be continued was greatly to its advantage to make. In the light of subsequent events it is apparent that the value of the property had been deflated, but those charged with the management and control of it had not yet adjusted themselves to the changed condition. Under the facts in this case, the conduct of the trustee and the bondholders as represented by their attorneys is to be commended rather than condemned. The most that can be said is that they co-operated with the representatives of the stockholders and general creditors in an effort to save something for those whose claims were subsequent. This conduct on the part of counsel certainly ought not to subject their clients to liability. If that course were pursued in the case of a failing corporation, all avenues of co-operation would be closed, and all that a prior claimant could do would be to institute foreclosure proceedings and so destroy every reasonable probability of saving something for subsequent claimants. While the trustee was not made a party to the receivership proceedings, it was no doubt at all times a proper though not a necessary party, and we do not regard the fact that the trustee or the bondholders by their attorneys participated in the proceeding as in any way constituting a waiver of the rights of the trustee and the bondholders under the trust deed. The property of the company was *in custodia legis* and the rights of all parties were proper subjects of the court's consideration. They merely followed the property which was the security for the payment of the bonds to assert and protect their rights, not to waive and surrender them. It is conceivable at least that an operating receivership might be conducted for the benefit of a mortgagee as

well as of subsequent claimants, in which event an entirely different situation would arise.

We think the law is correctly stated in *Kneeland v. American L. & T. Co.* 136 U. S. 89, 97, 10 Sup. Ct. 950, 953. The court there said:

"It has been assumed that a court appointing a receiver could rightfully burden the mortgaged property for the payment of any unsecured indebtedness. Indeed, we are advised that some courts have made the appointment of a receiver conditional upon the payment of all unsecured indebtedness in preference to the mortgage liens sought to be enforced. Can anything be conceived which more thoroughly destroys the sacredness of contract obligations? One holding a mortgage debt upon a railroad has the same right to demand and expect of the court respect for his vested and contracted priority as the holder of a mortgage on a farm or lot. . . . It is the exception, and not the rule, that such priority of liens can be displaced. We emphasize this fact of the sacredness of contract liens for the reason that there seems to be growing an idea that the chancellor, in the exercise of his equitable powers, has unlimited discretion in this matter of the displacement of vested liens."
. . . See cases cited in Rose's Notes, 34 Lawy. Ed. p. 128 of notes. See note in 54 Am. St. Rep. 402; note, 2 L. R. A. N. S. 1018; 41 L. R. A. N. S. 71.

"Extensive as are the powers of courts of equity, they do not authorize a chancellor to thus impair the force of solemn obligations and destroy vested rights. Instead of displacing mortgages and other liens upon the property of private corporations and natural persons, it is the duty of courts to uphold and enforce them against all subsequent incumbrances. It would be dangerous to extend the power which has been recently exercised over railroad mortgages (sometimes with unwarranted freedom), on account of their peculiar nature to all mortgages. The power does not exist, and the application is denied." *Farmers L. & T. Co. v. Grape Creek C. Co.* 50 Fed. 481, 16 L. R. A. 603.

In this case the property of the Casting Company was sold, thereby saving the expense and delay incident to a

foreclosure sale. By stipulation of parties and order of the court the proceeds of the sale were impressed with the liens existing against the property sold. The court subordinated the claim of the first mortgagee to the expenses of the sale, the taxes, insurance, watchman's services, etc., because they were expenses which would necessarily be incurred by the first mortgagee in realizing upon the property by foreclosure.

Within the doctrine of the cases cited, upon the facts presented in this case, there is no possible ground upon which it can be held that the first or second mortgagee was in any manner or to any extent benefited by the receivership proceedings and so chargeable with the expense of the receivership beyond the amount allowed by the court.

We do not attempt to set bounds to the equitable powers of a court in receivership proceedings. The question presented here is rather what should a court of equity do in accordance with the established equitable principles in the exercise of its powers? Arguments based upon the language of statutes, or statements and decisions taken apart from the facts in the case in which the decision was rendered and which ignore the broad general underlying principles of equity, are not persuasive. A party's legal rights are not to be ignored and disregarded merely because the affairs of an insolvent corporation are being administered by a court of equity. The reasons supporting the rule and the justness of the result reached by its application in this case are so plain as not to require further exposition.

II. Did the court err in allowing the first and second mortgagees interest upon their secured claims? The argument that the court erred in allowing interest to the first and second mortgagees is based principally upon the case of *People v. American L. & T. Co.* 172 N. Y. 371, 65 N. E. 200. See, also, *Thomas v. Western Car Co.* 149 U. S. 95, 13 Sup. Ct. 824; *Gillett v. Chicago T. & T. Co.* 230 Ill. 373, 82 N. E. 891; *Att'y Gen. v. Supreme Council A. L. H.* 206

Mass. 131, 92 N. E. 134. These cases deal in the main with the right of a preferred claimant to interest upon his claim presented in a receivership proceeding instituted to wind up a corporation. What the claimants have in such case as that is a contract right against the insolvent corporation and not a specific lien upon the assets of the corporation such as a mortgagee has. The idea that stockholders and subsequent creditors can suspend a mortgagee's right to interest under his contract by bringing about a receivership of the corporation does not accord with one's sense of justice. Where the claims against an insolvent estate are of the same rank, or where they are not liens upon the assets but mere preferred claims, a different rule seems to prevail, although in such cases the rule is not uniform. As to liens upon assets, the rule is stated in *Spring Coal Co. v. Keech,* 239 Fed. 48, where it is said:

"We do not understand that the courts have ever declared that interest upon contracts which provided for interest must stop in any and all events when property passes into the hands of the court. That is a rule adopted by the court for its convenience in the distribution of insolvent estates and when all claims are of equal rank or dignity. When the estate is insolvent, it is immaterial to the creditor whether the dividend is calculated on the basis of the principal alone, or of the principal and interest combined. But where there are debts of different rank or dignity, this general rule does not apply. Mr. Justice LAMAR, in the case of *American Iron & Steel Mfg. Co. v. Seaboard Air Line R. Co.* 233 U. S. 261, 58 Lawy. Ed. 949, 34 Sup. Ct. 502, said: 'Principal as well as interest, accruing during a receivership, is paid on debts of the highest dignity, even though what remains is not sufficient to pay claims of a lower rank in full,' citing *Central Trust Co. v. Condon,* 14 C. C. A. 314, 31 U. S. App. 387, 67 Fed. 84; *Richmond & I. Const. Co. v. Richmond, N., I. & B. R. Co.* 34 L. R. A. 625, 15 C. C. A. 289, 31 U. S. App. 704, 68 Fed. 105; *First Nat. Bank v. Ewing,* 43 C. C. A. 150, 103 Fed. 168."

The reasons assigned by the court in *People v. American L. & T. Co., supra,* are stated as follows and are said to apply as between preferred and unpreferred creditors:

"A corporation is created by the edict of the legislature and dies at its command. Knowledge is imputed to all who deal with it that when it suspends business the law takes charge of its affairs, liquidates its debts, converts its assets, and distributes the proceeds among its creditors. Those who contract with it do so 'with knowledge of the statutory conditions, and these must be deemed to have permeated the agreement and constituted elements of the obligation.' . . . The process of administration provided by law is through a receiver, as the executive arm of the court. He is appointed for the benefit of all the creditors, both preferred and unpreferred, and holds the assets, under the direction of the court, in trust primarily for them and finally for the corporation or its stockholders. Thereupon by operation of law the creditors become the equitable owners of the assets and the administration of affairs is for their benefit as such. The claims of creditors against the defunct corporation differ from their claims against its assets in sequestration, for they are not proved against the insolvent and dissolved nonentity, but against the fund in the receiver's hands."

The rights of the mortgagees in this case are in no respect dependent upon the receivership. The corporation while a going concern had pledged certain of its assets to secure the payment of a stipulated amount. The rights of the mortgagees are referable to the mortgages under which they claim. In the case of a natural person who dies, the law takes hold of his estate and administers it first for the benefit of creditors after the payment of the taxes and then for the benefit of those who are rightfully entitled to receive it; but where a person has during his lifetime pledged certain assets belonging to him to secure the payment of a sum with interest, we find no case and have been cited to none where it is held that against an insolvent estate the pledgee is not entitled to receive the amount stipulated in the contract, in-

cluding interest. A natural person dies in the course of nature, the artificial person by the edict of a court. Claims of creditors are against the assets in each case. We see no reason why a different rule should prevail in one case than the other. See *Walter v. Peninsula Cut Stone Co.* 9 Del. Ch. 374, 82 Atl. 961; *First Nat. Bank v. Ewing,* 103 Fed. 190; *First Nat. Bank. v. Campbell Co.* 52 Tex. Civ. App. 445, 114 S. W. 887; *Richmond & I. Const. Co. v. Richmond, N., I. & B. R. Co.* 68 Fed. 105, 34 L. R. A. 625; *American I. & S. Mfg. Co. v. Seaboard Air Line,* 233 U. S. 261, 34 Sup. Ct. 502.

It is considered that the court, in allowing interest upon the first mortgage in accordance with the terms of the contract, did not err.

III. Did the court err in making the following findings:

"37. I further find that the Hercules Steel Casting Company placed in the premises described in finding No. 1 all of the apparatus, fittings, machinery and fixtures, including all boilers, engines, dynamos, air compressors, shafts, cranes, traveling cranes, hoists, trucks, runways, belting, chains, shop equipment, tools, furnaces, and shears that were conveyed to Pawling & Harnischfeger Company for the obvious purpose of using the same in its foundry operations, and that it actually did use all thereof for foundry purposes, and that such use enhanced the value of the lands and buildings for the purpose of a foundry.

"38. I further find that all of the property described in the last finding was mortgaged to First Wisconsin Trust Company as real estate; and that Bankers' Finance Corporation, Hercules Steel Casting Company, and First Wisconsin Trust Company intended that said property should be considered and construed to be real estate for the purpose of said mortgage.

"39. I further find that all of the boilers, engines, air compressors, shafts, cranes, traveling cranes, hoists, tracks, runways, belting, furnaces, rolling mills, shears, and all other machinery conveyed to Pawling & Harnischfeger Company was so physically attached to the lands and buildings of Hercules Steel Casting Company as to be a permanent addition thereto.

"40. I further find that all of the flasks that were sold to Pawling & Harnischfeger Company (both wood and steel) were made by the Hercules Steel Casting Company plant for the purpose of being utilized in carrying on its foundry operations; that said flasks had no other value than as scrap except for foundry purposes; that they actually were used in carrying on the foundry business of Hercules Steel Casting Company and became and were shop equipment within the terms of the mortgage of Hercules Steel Casting Company to First Wisconsin Trust Company; that a part of said flasks were in said foundry and in such use at the time of the execution of said mortgage and the recording thereof, and the balance were manufactured by the Hercules Steel Casting Company from time to time thereafter for use in its foundry for foundry purposes, and were added to the shop equipment described by said trust mortgage and became a part of the shop equipment of the foundry and were so used prior to the appointment of the receiver herein and the sale thereof to Pawling & Harnischfeger Company.

"41. I find that the following property conveyed to Pawling & Harnischfeger Company, pursuant to the receiver's sale and none other, was personal property, to wit: auxiliary machinery, except air hammers and air rammers, supplies, raw material, loose tools other than air tools; office and factory furniture and fixtures; Ford truck and laboratory apparatus, and that the reasonable market value of said personal property at the time of said sale was three thousand seven hundred sixty dollars ($3,760), to wit: auxiliary machinery, supplies and raw material, fifteen hundred sixty dollars ($1,560). Loose tools (other than air tools, valued at $200), six hundred dollars ($600). Office furniture and fixtures, five hundred dollars ($500). Factory furniture and fixtures, five hundred dollars ($500). Laboratory apparatus, two hundred dollars ($200). Ford truck, four hundred dollars ($400). The reasonable market value of the flasks sold to Pawling & Harnischfeger Company by the receiver was one thousand dollars ($1,000). The reasonable market value of all of the property sold to Pawling & Harnischfeger Company by the receiver herein was one hundred twenty-seven thousand five hundred dollars ($127,500), and Pawling & Harnischfeger Company paid said sum, together with certain items for interest and watchman's pay as follows: one hundred eighteen thousand and two hun-

dred fifty-two and 50/100 dollars ($118,252.50) to the clerk of this court, and ten thousand four hundred fourteen dollars ($10,414) to Edward L. Cullen, receiver, making the total proceeds of the sale to Pawling & Harnischfeger Company one hundred twenty-eight thousand six hundred sixty-seven and 18/100 dollars ($128,667.18).

"42. I find the reasonable market value of the real estate and fixtures thereto appertaining constituting said foundry property was one hundred twenty-three thousand seven hundred forty dollars ($123,740) at the time of said sale to Pawling & Harnischfeger Company;"

—and in adjudging that of the purchase price $123,740 should be allocated to the first mortgage and $3,760 to the second mortgage. As to all fixtures involved in the controversy other than flasks, we have no doubt the trial court correctly held that they passed to the first mortgagee under its mortgage and the court correctly held them subject to the lien of that mortgage. A more difficult question is presented respecting the flasks. It is contended by the second mortgagee that the evidence establishes that the flasks were personal property and valued as follows: wooden flasks and parts, $1,629.30; metal flasks and parts, $7,568.46; additional wood flasks and parts, $289.25; additional miscellaneous flasks and parts, $312. Principally upon the testimony of one of the managing officers of the Pawling & Harnischfeger Company, the purchasers of the plant and equipment, the trial court found that these flasks were of the value of $1,000.

Flasks vary in size from a receptacle of small dimensions to steel flasks weighing several hundred pounds. They are not attached in any way to the building, but are designed to be moved about from place to place as is necessary and convenient in the operation of a foundry. They contain the mold into which the molten metal is run in the making of castings. The size of the flask is dependent very largely upon the size of the casting to be made. So far as appears

from the evidence they are not bought and sold as ordinary articles of commerce, but are made in the place where they are to be used as and when needed. They may be used a great many times or they may be used but once or a very few times, depending on the nature of the business in which the foundry is conducted. While they may be bought and sold and moved from place to place, that does not appear to be the customary practice with equipment of this kind. When they are not in use they are ordinarily stored in or about the foundry. Generally speaking, their value apart from the plant is that of scrap, principally because foundries are equipped with such flasks as are ordinarily needed which have been made in the foundry from time to time as occasion requires. In this case the flasks had some considerable value because they were purchased by a concern which intended to continue the operations of the foundry. The smaller flasks with the castings may be moved by hand; the larger ones are moved about by means of the cranes and lifting machinery ordinarily used to operate a foundry. It clearly appears that flasks are a necessary integral and indispensable part of the equipment of a foundry. They are designed for use in the foundry and as a part of its equipment. No foundry could conduct any operation without the use of a flask. As already indicated, the first mortgage was upon the real estate, describing it, "together with all of the buildings and improvements situated thereon or which shall or hereafter may be erected or placed thereon, and all and singular the rights, privileges, easements, tenements, hereditaments and appurtenances unto said lands in anywise appertaining, together with all apparatus, fittings, machinery and fixtures, including all boilers, engines, dynamos, air compressors, shafting, cranes, traveling cranes, hoists, tracks, runways, belting, chains, shop equipment, field equipment, tools, furnaces, rolling mills, shears, and all other machinery and equipment of every kind and description attached to said

premises and constituting part thereof," etc. There is no doubt but the description of the property embraced the flasks in question, but the trust deed was not recorded as a chattel mortgage. By sec. 241.08, Stats., it is provided:

"No mortgage of personal property shall be valid against any other person than the parties thereto unless the possession of the mortgaged property be delivered to and retained by the mortgagee or unless the mortgage or a copy thereof be filed as provided in section 241.10." . . .

Under this statute it has been held that a failure to take possession of the property or to record the mortgage operates to make the mortgage fraudulent and void as against other creditors of the mortgagor, even though no fraudulent intent is shown and even though the other creditor had actual notice of the existence of the mortgage when the debt to him was contracted. *Ryan Drug Co. v. Hvambsahl,* 89 Wis. 61, 61 N. W. 299.

We shall not stop to consider the effect of the exception contained in the description of the property in the second mortgage, which by its terms was expressly made subject to the first mortgage. There were other and subsequent mortgages which did not contain such exception, so that the question would be raised in any event. Because of the failure of the first mortgagee to record its mortgage as a chattel mortgage, we are required to determine to what extent the property in question was real estate and to what extent it was personal property.

Questions of what fixtures pass as real estate arise principally in the following situations: (1st) between vendor and vendee; (2d) mortgagor and mortgagee; (3d) landlord and tenant; (4th) owner of life estate and remainderman; (5th) seller under a conditional sales contract as against mortgagee and subsequent vendees and prior mortgagees; (6th) with reference to taxation. Generally speaking the rule is very liberal with respect to the rights of

mortgagees and vendees. A much stricter rule is applied as against a landlord in a contest between landlord and tenant. It is probable that no branch of the law is in greater confusion than the law of fixtures. Confusion is due in some degree at least to a failure to classify the cases. There is a constant tendency to carry over decisions in one classification and to apply them to cases in other classifications, ignoring the difference in the legal relation of the parties.

The rule was laid down in *Gunderson v. Swarthout,* 104 Wis. 186, 80 N. W. 465, where the question arose between a conditional vendor and a purchaser at a foreclosure sale as follows:

"The test for determining whether articles of machinery are fixtures is: (1) Actual physical annexation to the realty; (2) application or adaptation to the use or purpose to which the realty is devoted; (3) an intention on the part of the person making the annexation to make a permanent accession to the freehold."

It is further held that the same rules applicable as between grantor and grantee apply as between mortgagor and mortgagee. In this case the fixture was a dynamo weighing three and one-half tons, was fastened to timbers in the building by means of lag screws, and was moved from time to time. Other machinery was fastened to timbers in substantially the same way. The court, after citing a number of cases (p. 191) relating to various sorts of articles, held:

"Where the machinery attached is adapted to the purpose to which the realty is devoted, and is for the permanent use and improvement of the freehold, it is a fixture and a part of the realty; but where it is attached for a mere temporary use, with the present intention of removal, it continues to be personal property."

The doctrine of the *Gunderson Case* was reaffirmed in *State ex rel. Gisholt Machine Co. v. Norsman,* 168 Wis. 442, 169 N. W. 429, a carefully considered case where the question arose as to taxation and the rule that is applicable

as between vendor and vendee was applied. After reviewing the Wisconsin decisions the court said:

"The effect of these decisions is that when machinery adapted to the purposes of a manufacturing plant is installed therein and connected with the building by wires or belts, such machinery becomes a part of the freehold, and the land, buildings, and machinery so attached constitute an entity and pass by deed, mortgage, or other conveyance of the land. This doctrine is so firmly written into the decisions of this court as to have become a rule of property in this state, which it is our duty to respect and protect. . . .

"It is true that the question of whether property constitutes fixtures is largely one of intent. But where property is adapted to the use to which the realty is devoted, the use thereof in such manner furnishes such strong evidence of intent to make it a part of the freehold as not to be overcome by bookkeeping practices." See, also, *Anglo American M. Co. v. Wis. H. E. Co.* 189 Wis. 120, 207 N. W. 276.

The annexation referred to may be either (a) actual or (b) constructive. A chattel is said to be constructively annexed when it is a necessary indispensable integral part of the plant with which it is connected.

In *Dudley v. Hurst*, 67 Md. 44, 8 Atl. 901, it is said:

"Where in the case of machinery the principal part becomes a fixture by actual annexation to the soil, such part of it as may be not so physically annexed, but which, if removed, would leave the principal thing unfit for use, and would not of itself, and standing alone, be well adapted for general use elsewhere, is considered constructively annexed."

And in that case it was held that crates, capping machines, and work tables not actually annexed but essentially necessary to the working of the principal machinery, were a part of the realty constituting a canning factory.

So it has been held in regard to detachable wheels belonging to a polishing machine. *Pierce v. George,* 108 Mass. 78; duplicate cylinder for bluing machine, duplicate pulleys for grindstones, *Delaware, etc. R. Co. v. Oxford Iron Co.* 36

N. J. Eq. 452; theater scenery part of stage fittings, *Security Trust Co. v. Temple Co.* 67 N. J. Eq. 514, 58 Atl. 865; part of stone crusher which is attached to realty although not yet in position, *Geppelt v. Middle West S. Co.* 94 Kan. 560, 146 Pac. 1157. See, also, *Miller v. Watson,* 71 Iowa, 610, 33 N. W. 128; platform scales, *Thompson v. Smith,* 111 Iowa, 718, 83 N. W. 789, 50 L. R. A. 780.

A careful review of the cases leads one irresistibly to the conclusion that in recent cases greater weight is given to intention and use than to the matter of mere physical attachment. This is clearly indicated by the decisions in Wisconsin. The rule is stated thus in 1 Jones on Mortgages (8th ed.), sec. 554:

"A distinction is properly made between such fixtures in a mill as are indispensable to its use as a mill, and the movable machines in it, which may be dispensed with upon a change in business to which the mill may be readily adapted. Of the former class are such as are used for furnishing the motive power; and if the mill is adapted to one business only, the machinery necessary for that business may be included in the same class. To this class also belongs machinery specially adapted to carry out the purpose for which the mill was erected, and presumably to increase its value, although it may be removed without injury to the building.

"Of the other class are movable machines used in a mill adapted to various kinds of business, which may be wholly set aside, and still the value and usefulness of the mill property would not be materially impaired. Such machinery, not being indispensable to the enjoyment of the realty, is generally considered not to be a part of it, and not to pass by a mortgage of it."

In a number of states where a strict rule as to fixtures prevailed under which it was required that they should be substantially attached to the freehold, statutes have been passed relaxing the rule, thus indicating that it was not meeting the requirements of modern business conditions. Rev. Stats. Vermont 1894, par. 2269; Gen. Laws R. I.

1923, ch. 295; Gen. Stats. Conn. 1918, par. 5206. In addition to the cases already cited and those cited in Jones on Mortgages, see the following cases: *Triumph Elec. Co. v. Patterson,* 211 Fed. 244; *Cook v. Condon,* 6 Kan. App. 574, 51 Pac. 587; *Humes v. Higman,* 145 Ala. 215, 40 South. 128; *Canning v. Owen,* 22 R. I. 624, 48 Atl. 1033; *In re Beeg,* 184 Fed. 522; *Lyle v. Palmer,* 42 Mich. 314, 3 N. W. 921.

In *Re Eagle Horseshoe Co.: Milwaukee Trust Co. v. Fidelity Trust Co.* 163 Fed. 699, the question of what fixtures pass as realty arose between a mortgagor and mortgagee. The decision was by the circuit court of appeals, GROSSCUP, J., speaking for the court. In that case it was contended that under the law of Wisconsin "three concurring tests are essential to make any article a fixture, viz.: (1) actual physical annexation to the realty; (2) application or adaptation to the use or purpose to which the realty is devoted; and (3) the intention on the part of the person making the annexation to make a permanent accession to the freehold." It was conceded that if all of these tests were to be applied independently the appellant's contention respecting the extra rolls, tools, and the like should be sustained. The court said:

"But we do not so understand the ruling of the supreme court of Wisconsin, especially in cases not covering the relations of landlord and tenant. Our understanding of the decisions of the supreme court of Wisconsin is, that in manufacturing plants where machinery is purchased and used in connection with the plant, the intention to devote such machinery to the use of the realty, accompanied with the act of bringing it on the realty, amounts to annexation."

This was held to be in accordance with the entity doctrine adopted by the supreme court of the United States in *Hill v. National Bank,* 97 U. S. 450.

We have not classified the cases because the rule applied where the question arises between mortgagor and mortgagee

is as to the mortgagee the most liberal of any; therefore a rule applicable to any relationship where the rule is less liberal would apply with greater force in the present case.

Very slight incidents, such as connection by an electric wire, by a leather belt, or other slight physical annexation which might be severed without injury either to the personalty or the realty, are seized upon by many courts as a basis for holding the fixture a part of the realty. It is considered that a rule based upon such slight circumstances is not well grounded. It is considered that what makes a fixture attached by a belt or wire or pipe a part of the realty is the use to which it is put rather than the mere physical attachment. If it is a necessary integral part of the plant, as between mortgagor and mortgagee it is considered realty. A different rule prevails in many instances as between landlord and tenant. As already pointed out in the present case the flasks are an integral indispensable element in the operation of a foundry; they are made upon the premises, designed to be used there when and as needed, and in accordance with the great weight of authority it must be held that the flasks along with the other articles described were a part of the realty and passed to the first mortgagee and that the trial court correctly so held.

Many collateral questions were properly raised, but the determination of the propositions already set out makes it unnecessary to consider and decide other questions presented.

*By the Court.*—Judgment affirmed.

A motion for a rehearing was denied, with $25 costs, on October 9, 1928.