Argued January 23; reversed March 24, 1936

## MARSH ET AL. *v.* ARTHUR C. MARSH CO.
### (55 P. (2d) 1111)

*Stephen H. Boyles*, of Portland (Albert L. Gordon, of Portland, on the brief), for Investors Syndicate.

*A. E. Wheelock*, of Portland, for receiver of Arthur C. Marsh Company.

ROSSMAN, J. The sole issue presented by this appeal is whether the Investors Syndicate, appellant, which holds mortgages upon numerous properties of the Arthur C. Marsh Company, defendant, should be deemed liable to the receiver for any part of the compensation which he earned in performing his duties, and whether, if compensation is due him from the appellant, the liability should be deemed a charge upon the property covered by the appellant's mortgages with priority over the first mortgages held by that mortgagee. The receiver was appointed in a friendly suit instituted by a majority of the stockholders of the Marsh Company. The appellant was not a party to that suit and did not participate in it in any way except to apply, on July 24, 1934, for leave to foreclose 38 of its mortgages, and, on November 5, 1934, to apply for leave to foreclose 16 more mortgages.

Near the city of Portland is a residential district known as Roseway Plat No. 2. In 1930 there were 76 dwelling houses in that district, 65 of them being subject to mortgages in favor of the Investors Syndicate. These were first mortgages and the total principal then unpaid upon them was $83,150.57. After the execution

of these mortgages the Arthur C. Marsh Company acquired ownership of the tract, but did not subject itself to liability for the payment of the mortgage debts. Mortgages on the 11 other properties were held by various individuals. All of these properties had been sold to purchasers who had agreed to pay the purchase price in monthly installments. July 25, 1930, the total unpaid upon these contracts, exclusive of the sums payable upon the mortgages, was $62,844.34. June 30, 1931, 54 of the properties were still in the possession of vendees who were making some payments upon the purchase price. Twelve of the properties had been abandoned by purchasers, and the houses were either vacant or were occupied by tenants.

July 25, 1930, a majority of the stockholders of the Arthur C. Marsh Company filed a complaint in the circuit court against that company which alleged that the Marsh Company had assets ''of a fair and reasonable value over and above any and all prior encumbrances, if permitted to be liquidated in the orderly course of business, in excess of $125,000. That the cash on hand and on deposit of defendant corporation and its liquid assets have been reduced to a point where they are not sufficient to promptly meet all demands, and that certain of the securities held and owned by it are of such character that they can not be immediately converted into cash except at an excessive sacrifice, to the irreparable loss and injury of the creditors and the preferred and common stockholders. That the defendant corporation is in imminent danger of insolvency. * * * That the creditors of defendant, particularly the unsecured creditors and the plaintiffs and others, as owners and holders of preferred and common stock, will suffer great and irreparable injury unless the assets of defendant corporation be protected from fur-

ther reduction and depreciation, and unless a qualified and disinterested person be appointed by this court as receiver." The complaint prayed for the appointment of a receiver and "that all creditors and any and all persons be enjoined from instituting or prosecuting any actions, suits or proceedings in law or in equity against the defendant corporation and from foreclosing or attempting to foreclose" their mortgages. On the same day the Marsh Company, the sole defendant in the suit, filed its answer which admitted all the averments of the complaint, and concluded thus: "Expressly prays for the relief prayed for in the complaint." July 25, 1930, the circuit court, in an order which recited: "It appearing that great and irreparable injury will be suffered by the creditors and by the preferred and common stockholders of defendant corporation unless its assets be protected from further reduction and depreciation," appointed Mr. John K. Kollock, now deceased, receiver.

July 25, 1930, the receiver filed a report which included the balance sheet of the Marsh Company. The report and the balance sheet at the time the Marsh Company passed into receivership show that it carried upon its books as assets the following:

| | |
|---|---:|
| Cash on hand and in bank | $ 24.25 |
| Accounts receivable | 150.16 |
| Notes receivable | 23,532.23 |
| Notes receivable on subscriptions to stock | 46,535.27 |
| Real estate loans and mortgages | 28,422.92 |
| Investments | 19,967.20 |
| Roseway first mortgages | 84,382.65 |
| Roseway contracts | 62,844.34 |
| Roseway miscellaneous | 1,575.95 |
| Furniture and fixtures | 9,761.66 |
| Profit and loss | 98,244.89 |
| | $ 375,441.52 |

The same source of information indicates that the Marsh Company carried upon its books as liabilities the following:

| | |
|---|---:|
| Capital stock subscribed but not issued ....$ | 51,125.00 |
| Capital stock issued | 215,700.00 |
| Notes payable | 3,100.00 |
| Mortgage contracts payable | 10,000.00 |
| First mortgages payable | 80,439.86 |
| Second mortgages payable | 5,170.84 |
| Accounts payable | 9,905.82 |
| | $ 375,441.52 |

The receiver was in charge during the four years and eight months that elapsed between the time of his appointment, July 25, 1930, and the time the attacked order was made, June 3, 1935. Of the various assets listed above, he was able to realize upon the following items only: cash on hand and in bank, notes receivable, notes receivable on stock subscriptions, investments, furniture and fixtures, and Roseway contracts. In each instance except the first the item brought much less than its valuation on the corporation's books. For instance, the furniture and fixtures, which were carried on the books at the depreciated value of $9,761.66, brought $675, and the investment item carried on the books at a value of $19,967.20 brought only $715.73. The item which became the receiver's principal source of income is the one entitled Roseway contracts. Under this head the Marsh Company entered the sums payable by purchasers of the dwelling houses in Roseway; that is, a total of $62,844.34. As time passed many of the purchasers of these homes abandoned their contracts. In some instances the vacated houses fell into a state of disrepair; the windows were broken and the plumbing fixtures were stolen. In other instances

renters were substituted for the departed contract purchasers. But some purchasers abided by their contracts and at the time this proceeding came on for hearing, June 3, 1935, three purchasers were still faithfully maintaining their payments and ten others had discharged their obligations. Thirty-two of the houses were then occupied by tenants at an average rental of $10 per month, which but few were able to pay regularly. The receiver's reports indicate that he received from the Roseway houses a total of $28,682.05. His total receipts from all sources were $64,423.56. Hence, since he received $28,682.05 from the Roseway properties, he must have collected from all other assets appearing upon the Marsh Company's balance sheet, $35,741.51. Of the latter sum, $15,089.33 was received by the receiver through his liquidation of the Interstate Security Company, all of the stock of which was owned by the Marsh Company. The proceeds of the liquidation under a contract existing between the two companies were applied upon the Interstate Security Company's subscription to the capital stock of the Marsh Company. The reports filed by the receiver indicate that a total of $11,849.77 was disbursed in the payment of "receivership expenses" which included rent, salary, automobile and minor office expenses. These reports indicate that there was paid to John K. Kollock, receiver, as compensation and fees, $6,200, and to his successor, Joseph H. Lieb, $1,800. Besides the latter sum Mr. Lieb also received a salary as an employee of Mr. Kollock prior to the latter's death. All of the above have been paid. The award of $4,750 made in the attacked order is additional compensation for services rendered since July 31, 1934. In the first annual report of the receiver, we find the following under the head of Roseway operating expenses:

| | |
|---|---:|
| Repairs | $ 67.73 |
| Taxes | 300.70 |
| Insurance | 535.91 |
| Water | 18.45 |
| Advertising | 26.74 |
| Survey | 15.00 |
| | $ 964.52 |

In the four following reports, we find no similar subtitle, but encounter in the report of January 26, 1933, the following items:

| | |
|---|---:|
| Repairs to houses | $ 287.13 |
| Taxes | 120.86 |
| Fire insurance | 69.01 |

In the report of August 12, 1933, we find:

| | |
|---|---:|
| Repairs to houses | $ 47.97 |
| Insurance | 96.91 |

In the report of August 1, 1933, we find:

| | |
|---|---:|
| Repairs to houses (including delinquent water bills) | $ 86.14 |
| Insurance (including bonds for receiver and automobile liability) | 180.90 |

In the report of August 1, 1935, we find a disbursement of $93.48 for repairs to houses and the payment of delinquent water bills.

As above stated, the receiver collected from the properties mortgaged to the appellant $28,682.05. He paid to the appellant $28,011.95. Although that sum of money was paid to the appellant during the four years and eight months that the receivership was in effect, the total due the appellant upon its mortgages on the day of the trial, April 29, 1935, was approximately $86,000. This increase in the size of the debt was due to the fact that the receiver was unable to collect enough from the properties to discharge the full

obligation expressed in the mortgages. During the receivership the appellant advanced from its own funds for the payment of taxes, $9,490.20, and for insurance premiums, $5,250.28.

Mr. Joseph Lieb, who became receiver on August 1, 1933, after the death of Mr. Kollock, testified that he lived near Roseway and visited the tract twice a week, making his visits in the morning before going to his office in Portland. The purpose of these visits was to determine whether any houses had become vacant and whether any of them needed repairs. He swore that he made minor repairs himself. The appellant never asked the receiver to perform any service whatever, but both Mr. Kollock and Mr. Lieb, his successor, requested the appellant to defer the foreclosure of its mortgages, in all instances expressing hopes of improvement in the real estate market sufficient to enable the receiver to sell the houses for more than the mortgage debt. At the receiver's request, the appellant reduced the amount of the monthly installments upon its contracts for the accommodation of the receiver. Apparently, the repairs made by the receiver were of a very minor character. Under the receivership many of the vacant houses lapsed into a state of disrepair. Some of them can not be placed in a condition for occupancy unless very substantial sums are expended for repairs. Mr. Lieb explained that his lack of funds restricted his repairs to those items only which were immediately necessary. When windows became broken in vacant houses the glass was not replaced unless he found a renter. He explained, "I had no additional funds to put the property in shape so they would be habitable." Mr. Lieb testified that until the early part of 1934 he had hoped that he could realize something from the

Roseway properties for the general creditors. Shortly prior to the abandonment of his hopes a flood had rendered valueless Washington property which the Marsh Company owned, subject to a $10,000 mortgage, from which the receiver expected to realize a substantial sum above the mortgage indebtedness.

So far as the record indicates, substantially all of the assets of the Marsh Company upon which anything can be realized for the benefit of the general creditors have been liquidated. Apparently, the receiver now possesses but little cash, and unless the appellant is liable for the services which the receiver has performed since July 31, 1934, when he was last awarded compensation, his services since that time will not be compensated.

■ The above will have to suffice as a statement of the facts. We believe it is apparent from the extracts of the complaint set forth in a preceding paragraph that the purpose of the plaintiffs, of whom the present receiver was one, in applying for a receivership was to protect the general creditors and the stockholders. The appellant manifestly had no need for a receivership. At that time the occupants of the properties, upon which it held mortgages of unpaid balances aggregating $83,150.57, had executed contracts binding themselves to pay $62,844.34 in excess of the amount of the mortgage indebtedness. Hence, the appellant seemed to possess adequate security for the debts owing to it. The complaint averred that the corporation's assets exceeded its liabilities to the extent of $125,000. A surplus of that amount, if it really existed, would have discharged all debts, defrayed the expenses of the receivership, and yielded a substantial return for the stockholders. This fact, as well as averments of the

complaint, render it apparent that the receivership was sought, not for the benefit of the appellant, who was not made a party to the suit, but for the benefit of others. But when the receiver attempted to realize upon the assets set forth in imposing array upon the balance sheet, many of the items quickly melted away. Hope was now transferred to the Roseway houses. Somehow, it was felt that the receiver could succeed in selling these houses at prices exceeding the mortgage indebtedness notwithstanding a declining real estate market, where the officers had failed, even though they had had the benefit of the pre-depression market. Then came the period of which we take judicial notice when all mortgagees were urged to be lenient and to refrain from foreclosing mortgages upon the homes of contract buyers and mortgagors. In response to the widespread sentiment that the depressed realty market ought not occasion a home owner the loss of his home through foreclosure of a mortgage, the federal government organized the Home Owners Loan Corporation, and provided that its resources should be available to delinquent mortgagors and contract buyers. While these developments were occurring, the appellant, at the repeated requests of the receiver, refrained from foreclosing, and even reduced the amount of the monthly installments. In fact, it went further and advanced from its own funds money to pay taxes and premiums on insurance policies.

Let us now review some of the authorities for the purpose of determining whether the appellant is liable to the receiver for any of the compensation which the circuit court awarded to him for his unpaid services. In *U. S. Investment Corp. v. Portland Hospital,* 40 Or. 523 (64 P. 644, 67 P. 194, 56 L. R. A. 627), the facts

were that the plaintiff held two mortgages upon a parcel of real property which was later subjected to a receivership. The receiver contracted debts for labor and supplies amounting to $10,000, all of which remained unpaid. In a suit instituted by the plaintiff for the foreclosure of its mortgages, the receiver sought to have this $10,000 liabilitiy declared a lien upon the property, with priority over the plaintiff's mortgages. In sustaining the decree of the circuit court which denied the priority, this court said:

"The ordinary duties of a receiver are to protect and preserve the property pending the litigation; and all expenses incurred by him in so doing, as well as a reasonable compensation for his services, are payable out of the income of the property, if any, or, if not, out of the property itself: Beckwith v. Carroll, 56 Ala. 12. But the duty to preserve the property by no means includes the right to create debts for other purposes. Before a receiver can incur such obligations, he must be authorized by the court; and even then debts created by him will not be preferred to prior liens unless such preference is given in the order authorizing him to incur the obligation, or in an order approving and ratifying the debts, and decreeing that they should be paramount liens. * * * But there is yet another reason why the decree should be affirmed. The suit in which the receiver was appointed was not one in which the court making the appointment had authority without the consent of prior lien creditors to decree that debts contracted by the receiver in carrying on the business of the defendant corporation should take precedence over prior contract liens. Where a court of chancery takes possession of a railroad or other similar property of public corporations, and operates the same through a receiver, debts contracted for labor, supplies, and other necessary purposes, before as well as after the appointment of the receiver, may be made a first lien upon the income, and, if that is not adequate, upon the corpus of the property. But this is an extraor-

dinary power, exercised only in cases of railroad and other like corporations of a quasi public character charged with a public duty, and for reasons peculiar to that character of property; * * * But under none of the authorities is a court authorized to thus displace contract liens upon the property of individuals or private corporations. 'Extensive as are the powers of a court of equity,' says Judge Gresham, 'they do not authorize a chancellor to thus impair the force of solemn obligations and destroy vested rights. Instead of displacing mortgages and other liens upon the property of private corporations and natural persons, it is the duty of courts to uphold and enforce them against all subsequent incumbrances. It would be dangerous to extend the power which has recently been exercised over railroad mortgages (sometimes with unwarranted freedom) on account of their peculiar nature to all mortgages.' * * * It is alleged in the answer, and insisted upon here, that the debts and liabilities were contracted by the receiver with the knowledge, and without the objection of the plaintiffs. It is doubtful whether this allegation is supported by the testimony. But, even if it is, it does not estop the plaintiffs from denying that such debts shall take precedence over their mortgage lien. The receiver was not appointed at their request nor upon their application, nor was there anything in the receivership proceedings to indicate to them that it was the intention to charge the mortgaged property with a preferred lien for debts contracted by the receiver. * *. * But where the appointment is not made upon his application he has a right to insist that the debts contracted by the receiver shall not take precedence over his lien, although he may be a party to the suit in which the receiver was appointed. * * * During the receivership some $1,800 or $2,000 was paid to the plaintiffs on their mortgage, and perhaps $500 or $600 spent in improving the mortgaged property, and it is contended that the creditors of the receiver are entitled to a lien upon the property for the amount of such payments and expenditures. Whether these were made from the earnings of the hospital or from donations by private persons is difficult to determine.

But, however that may be, no lien can be enforced therefor in this suit."

In *Stacey v. McNicholas,* 76 Or. 167 (144 P. 96, 148 P. 67), a receiver had been appointed for a mining property which was subject to a mortgage. In the suit which sought the receivership, the mortgage was attacked as fraudulent. The mortgagee appeared and sought the establishment of the validity of his mortgage. Later, he appeared again seeking leave to foreclose his mortgage. Still later he filed a motion to restrain the receiver from a contemplated course of action and also objected to the receiver being permitted to work the property, borrow money and incur indebtedness. Subsequently the court made an order permitting the receiver to issue certificates to the extent of $4,090.46 so as to secure funds with which to compensate himself for his services and to operate the property. The issue passed upon in this court's decision was whether these certificates, or any of them, were entitled to priority over the lien of the mortgage. Our decision held that the mortgagee acquiesced in the receivership "by failing to make timely objection and by participating in the proceedings". It pointed out that the only objection which he ever voiced was against the receiver's application for authority to operate the mines and to incur the debts incidental thereto, but that he never objected to the receivership itself. The properties subject to the receiver's administration were ditches, machinery, mines, etc. It is evident from the decision that these properties required constant care for their preservation. The decision subordinated the mortgage to an allowance of $930 to the receiver as compensation for his services, and also to the "expenses contracted by this receiver for labor and supplies which were necessary in order to care for and preserve the ditches, ma-

chinery and other property of the mine''. It held that the lien of the mortgage was otherwise prior to the lien of the certificates issued to discharge the expenses of operating the mine. In denying the priority just mentioned, the court reiterated the principles of law enunciated in *Investors Corporation v. Portland Hospital,* supra.

From *Anderson v. Robinson,* 63 Or. 228 (126 P. 988, 127 P. 546), we quote:

"It may be stated as a general rule that a receiver should not be appointed ex parte, without notice to the parties to be affected thereby, * * * There may be exceptions to this rule, such as where the interested party is out of the jurisdiction, or cannot be found, or where delay will jeopardize the delivery of the property, or where it is important that the court should interfere before there is time to give notice. * * * A defendant may be held to have waived any objection to an ex parte appointment by acquiescence therein, by failure to interpose a timely objection thereto, or by consenting to the appointment, or by participating in the proceeding thereafter.''

■ Besides citing the three decisions which we have just reviewed, the parties have called to our attention: *Nicholson v. Western Loan & Building Co.,* 60 Fed. (2d) 516; *Aetna Life Insurance Co. v. Leonard,* 186 Fed. 148; *In re Vulcan Foundry & Machine Co.,* 180 Fed. 671; *Hanna v. State Trust Co.,* 70 Fed. 2 (30 L. R. A. 201); *Farmers Loan etc. Co. v. Grape Creek Coal Co.,* 50 Fed. 481 (16 L. R. A. 603); *Seidler v. Branford Restaurant Inc.,* 97 N. J. Eq. 153 (127 Atl. 36) *Turner v. State Wharf & Storage Co.,* 263 Mass. 92 (160 N. E. 542); *Thomsen v. Cullen,* 196 Wis. 581 (219 N. W. 439); *Flint v. Danburg & Bethel Street Ry. Co.,* 101 Conn. 13 (125 Atl. 194, 40 A. L. R. 1); *Cox v. Snow,* 47 Idaho 229 (273

P. 933); *Rouge v. Lafargue Bros. Co.,* 49 La. Ann. 998
(22 So. 190); 56 C. J. p. 187, § 261, and p. 265, § 443; 34
Cyc. 351. We have carefully read each of these authori-
ties, but deem it unnecessary to set forth a review of
them herein, because, in our opinion, they are not at
variance with the holdings or language of the three de-
cisions above reviewed. The decisions, in our opinion,
hold that unless the charge for which the receiver seeks
payment out of the mortgagee's interest in the prop-
erty was incurred in preserving or protecting the
property against loss, waste or destruction in such a
way that the mortgagee's interest was served, the
compensation will not be awarded at the latter's ex-
pense. Of course, there are exceptions to this rule.
One of them concerns property devoted to a public in-
terest and is mentioned in *U. S. Investment Corp. v.
Portland Hospital,* supra. Another exception is noted
and applied in *Seidler v. Branford Restaurant, Inc.,*
supra. There the mortgagee availed himself of the
receivership proceedings as an expeditious means of
liquidating the mortgaged property. That, however,
was not really an exception to the rule above noted, for
the sale of the property by the receiver and its preser-
vation in the meantime was a valuable service which
the receiver performed for the mortgagee. The rule
with which we are now dealing is stated in Clark on
Receivers (2d Ed.), § 641:

"The just rule and that rule generally adopted by
the court is that property which is benefited by the
receivership should bear its share of the costs and ex-
penses of the receivership including receiver's fees.
If property is placed in the hands of a receiver and is
preserved or otherwise acted upon for the benefit of
the general creditors, they should pay the receivership
expenses, including receiver's fees. If the property is

preserved or otherwise acted upon for the benefit of lienholders, then they should bear the costs and expenses of the receivership or their share of the same including receiver's fees. However, the law jealously protects vested rights and mortgagee's rights and lienholder's rights, particularly in receivership cases other than railroad, public utility or quasi-public utility cases. However, even in cases of private corporations where lienholders either expressly or impliedly consent to a receivership of the property over which they hold a lien, and the receivership benefits their property, either by preserving it or realizing it or otherwise, then such lienholders may have to bear their portion of the costs and expenses of the receivership, including receiver's fees. * * * When a receiver is appointed of a corporation at the instance of a general creditor or otherwise and no receivership is necessary to protect the interest of lienholders, and when the lienholders do not demand a receivership and the services of the receiver are not beneficial to the lienholders then the receiver's fees and other disbursements should not be provided out of the fund of the lienholders. This is particularly true in a non-railroad and non-public service corporation receivership. If the lienholders on the other hand bring the receivership proceedings themselves, or adopt the existing receivership as a means of collecting their debts and do not with reasonable promptness pursue their remedies of foreclosure or otherwise after appointment of receivers, then such lienholders should bear their part of the expenses of the receivership including compensation to the receiver for himself and his counsel.''

■ In the present instance, the appellant did not ask for the receiver's appointment and did not participate in his selection. It never requested him to perform any service for it and never interfered with his discharge of his duties. It appeared in the suit which brought about the appointment of the receiver only for the purpose of obtaining leave to foreclose its mort-

gages. The receivership was not sought for its benefit; quite to the contrary, the purpose of the receivership was antagonistic to the appellant; that is, to prevent it from enforcing its rights. Neither the averments of the complaint nor the order appointing the receiver afforded the appellant any notice that it would be asked to contribute toward the expenses of the receivership. Nothing occurred at any subsequent time which the appellant should have construed as an indication that the receiver was looking to it for compensation. When Mr. Lieb, the receiver who is now asking compensation, was upon the witness stand he testified, "I led them to believe that everything was okeh and got them into a jackpot without their knowledge". We do not believe that appellant's delay in foreclosing its mortgages should be construed as acquiescence in the receivership. Postponing the enforcement of its right was in the nature of cooperation with the receiver. The postponement was sought for and served the interests of the general creditors. It, in fact, enabled the receiver to discharge the mortgages upon ten of the houses, thereby apparently yielding something for the general creditors. A prompt foreclosure would have frustrated all of his hopes. We have already mentioned the fact that during the period of the delay mortgagees everywhere were being implored to postpone foreclosure of their mortgages. See 1933 Session Laws, p. 922, and *Teachers' Retirement Fund Association v. Pirie,* 150 Or. 435 (46 P. (2d) 105). In view of the attendant circumstances, we believe that appellant acted with reasonable promptness when it applied for leave to foreclose its mortgages. The delay, far from subjecting appellant to liability for the receiver's services, should entitle it to commendation. Nor do we find that the appellant received any benefit from the receivership for which

it should pay. It is true that the receiver paid a very substantial sum of money to the appellant, but it had a right to all of that money, and more. Had the debtor itself made the payments, it could not have charged for the service performed in making payment. In making payment the receiver was not seeking to serve the mortgagee, but was doing what he thought was best for the unsecured creditors and the stockholders. The holding in *U. S. Investment Corp. v. Portland Hospital,* supra, is a complete answer to the contention that the making of these payments ought to subject the appellant to payment for the receiver's services. We are not now overlooking the fact that the receiver made repairs to some of the houses; but these repairs were of a minor nature. They were made, not for the purposes of preservation, but to provide immediate income. Expensive repairs that were necessary to prevent theft and ruin were foregone. The receiver was thinking of the general creditors, and not of the lienholders. Without setting forth further our analysis, we express the belief that the receivership was a speculation in the interests of all except the lienholders, and, that being our belief, it follows that those for whose benefit it was conducted should pay the expenses. We believe that the appellant is not liable to the receiver for any part of the compensation that the circuit court awarded to him and his attorney.

The cause will be remanded to the circuit court with instructions to eliminate the portions of its decree which are at variance with the above conclusions. Costs will be allowed to neither party.

CAMPBELL, C. J., and KELLY and BELT, JJ., concur.