Argued on remand from U. S. Supreme Court October 2, 1957,
former opinion adhered to December 4, 1957, order
denying certiorari U. S. Supreme Court
May 5, 1958

IN THE MATTER OF THE APPLICATION OF
FRANK VICTOR PATTERSON
318 P. 2d 907

*Allan Hart* and *Leo Levenson*, Portland, argued the cause for petitioner. With them on the brief were Nels Peterson, R. W. Nahstoll, Dennis J. Lindsay, Verne W. Newcomb, and Harlow F. Lenon, Portland.

*Alan F. Davis*, Portland, argued the cause for the Oregon State Bar.

PER CURIAM.

On October 10, 1956, we rendered a decision in this case denying the petitioner's application for ad-

mission to the bar. 210 Or 495, 302 P2d 227. On May 13, 1957, the Supreme Court of the United States granted certiorari and ordered:

> "The judgment of the Supreme Court of Oregon is vacated and the case is remanded for reconsideration in light of Konigsberg v. State Bar of California, No. 5, October Term, 1956, —— US ——, 1 L ed 2d 810, 77 S Ct ——; and Schware v. Board of Education of New Mexico, No. 92, decided May 6, 1957, —— US ——, 1 L ed 2d 796, 77 S Ct ——. See also Brinkerhoff-Faris Trust & Sav. Co. v. Hill, 281 US 673, 74 L ed 1107, 50 S Ct 451." 352 US 953, 1 L ed2d 906.

After receipt of the mandate of the Supreme Court we heard argument upon the question whether our decision was in conflict with the Konigsberg and Schware cases: The case of *Brinkerhoff-Faris Trust & Sav. Co. v. Hill,* referred to in the Supreme Court's order, is not pertinent here. It was apparently cited to a procedural point with which we are not concerned.

In *Schware v. Board of Bar Examiners of New Mexico* the application of Schware to take the New Mexico bar examination was denied by the Board of Bar Examiners of that state and its action affirmed by the Supreme Court of New Mexico (60 NM 304, 291 P2d 607) because of Schware's former membership in the Communist Party, his former actions in the use of aliases and his record of arrests, and his "present attitude towards those matters." 353 US 238. He joined the Young Communist League in 1932 at the age of 18 years, and thereafter the Communist Party. He left the Communist Party in 1937, later rejoined it, and quit it in 1940, apparently because of the Nazi-Soviet Non-Aggression Pact of 1939. He entered the University of New Mexico Law School in 1950, and at that time went to the dean "and told him of his

past activities and his association with the Communist Party during the depression and asked for advice. The dean told him to remain in school and put behind him what had happened years before." 353 US 238. Three years later, upon graduation from the law school, he was denied the right to take the bar examination.

We are not concerned here with any of the facts of the Schware case other than his membership in the Communist Party. The court held that the Supreme Court of New Mexico was not justified in assuming that "in the 1930's when petitioner was a member of the Communist Party, it was dominated by a foreign power and was dedicated to the violent overthrow of the Government, and that every member was aware of this. * * * During the period when Schware was a member, the Communist Party was a lawful political party with candidates on the ballot in most States. There is nothing in the record that gives any indication that his association with that party was anything more than a political faith in a political party." 353 US 244. The court called attention to the fact that Schware joined the Communist Party "when he was a young man during the midst of this country's greatest depression. Apparently many thousands of other Americans joined him in this step," and that there was nothing to indicate "that he ever engaged in any actions to overthrow the Government of the United States or of any state by force or violence, or that he even advocated such actions. Assuming that some members of the Communist Party during the period from 1932 to 1940 had illegal aims or engaged in illegal activities, it cannot automatically be inferred that all members shared their evil purposes or participated in their illegal conduct." 353 US 245-246. The court concluded that "his past membership in the Com-

munist Party does not justify an inference that he presently has bad moral character" (353 US 246), and that the state of New Mexico had deprived Schware of due process of law in denying him the opportunity to qualify for the practice of law. Accordingly the judgment was reversed and the cause remanded for further proceedings not inconsistent with the opinion.

*Konigsberg v. State Board of California* involved facts in many respects unlike those in the *Schware* case. Konigsberg had passed the bar examination. The Supreme Court of California affirmed without opinion the rejection by the Board of Bar Examiners of his application for permission to practice law on the grounds that he had failed to demonstrate good moral character and failed to show that he did not advocate the overthrow of the governments of the United States or the state by force, violence or other unconstitutional means. Both are made requisites for admission to the bar in California. The Supreme Court of the United States granted certiorari and reversed and remanded for further proceedings not inconsistent with its opinion. Again, the basis of the decision was the Due Process Clause of the Fourteenth Amendment.

There was some, though apparently not very satisfactory, evidence that Konigsberg had been a member of the Communist Party in 1941. Upon this subject the court said:

"Even if it be assumed that Konigsberg was a member of the Communist Party in 1941, the mere fact of membership would not support an inference that he did not have good moral character. There was no evidence that he ever engaged in or abetted any unlawful or immoral activities— or even that he knew of or supported any actions of this nature. It may be, although there is no evidence in the record before us to that effect, that some members of that party were involved in illegal

or disloyal activities, but petitioner cannot be swept into this group solely on the basis of his alleged membership in that party. In 1941 the Communist Party was a recognized political party in the State of California. Citizens of that State were free to belong to that party if they wanted to do so. The State had not attempted to attach penalties of any kind to membership in the Communist Party. Its candidates' names were on the ballots California submitted to its voters. Those who accepted the State at its word and joined that party had a right to expect that the State would not penalize them, directly or indirectly, for doing so thereafter." 353 US 267-268.

The Board of Bar Examiners held a number of hearings at which Konigsberg testified. He was asked whether he advocated overthrow of the government by force and denied it. The court said:

"Even if it be assumed that Konigsberg belonged to the Communist Party in 1941, this does not provide a reasonable basis for a belief that he presently advocates overthrowing the Government by force. The ex-Communist, who testified that Konigsberg attended meetings of a Communist unit in 1941, could not remember any statements by him or anyone else at those meetings advocating the violent overthrow of the Government." 353 US 271.

Konigsberg refused to answer questions of the examiners as to whether he was a member of the Communist Party or whether he had associated with persons who were members of that party, or groups which were allegedly Communist dominated. He based his refusal on his understanding that under the First and Fourteenth Amendments a state could not inquire into a person's political opinions or associations and that he had a duty not to answer. As to this the court said:

"* * * We find it unnecessary to decide if Konigsberg's constitutional objections to the Com-

mittee's questions were well founded. Prior decisions by this Court indicate that his claim that the questions were improper was not frivolous and we find nothing in the record which indicates that his position was not taken in good faith. Obviously the State could not draw unfavorable inferences as to his truthfulness, candor or his moral character in general if his refusal to answer was based on a belief that the United States Constitution prohibited the type of inquiries which the Committee was making. On the record before us, it is our judgment that the inferences of bad moral character which the Committee attempted to draw from Konigsberg's refusal to answer questions about his political affiliations and opinions are unwarranted." 353 US 270.

The court concluded:

"* * * In this case we are compelled to conclude that there is no evidence in the record which rationally justifies a finding that Konigsberg failed to establish his good moral character or failed to show that he did not advocate forceful overthrow of the Government. Without some authentic reliable evidence of unlawful or immoral actions reflecting adversely upon him, it is difficult to comprehend why the State Bar Committee rejected a man of Konigsberg's background and character as morally unfit to practice law." 353 US 273.

The court said that Konigsberg "was not denied admission to the California Bar simply because he refused to answer questions," explaining in a footnote that "Neither the Committee as a whole nor any of its members ever intimated that Konigsberg would be barred just because he refused to answer relevant inquiries or because he was obstructing the Committee." 353 US 259. What the decision would have been had the court thought that his refusal to answer questions was the basis of the California court's action is not clear.

Mr. Justice Harlan, joined by Mr. Justice Clark, filed a dissenting opinion in which they took the position that Communist membership was relevant to the question of forcible overthrow of the government, and that, since the questions asked by the examiners were both relevant and constitutionally not privileged, and the petitioner had the burden of proof "his failure to go forward is itself sufficient to support denial of admission." 353 US 311. The dissenting opinion concluded:

"* * * But what the Court has really done, I think, is simply to impose on California its own notions of public policy and judgment. For me, today's decision represents an unacceptable intrusion into a matter of state concern." 353 US 312.

Petitioner advances two propositions in his brief. These are:

"This Court's decision is in conflict with the Konigsberg and Schware cases because this Court rested its conclusion in part on the erroneous view that there is only one tenable interpretation of the Communist Party's character and aims, namely, that the Party is a conspiracy that is working for the violent overthrow of the government."

"This Court's decision is also in conflict with the Konigsberg and Schware cases because the Court necessarily rested its decision on an inference, drawn solely from petitioner's former Party membership and from his having been on the Party's State Board for Oregon, that petitioner understood and agreed that the Communist Party does advocate the forcible overthrow of the government, and that petitioner believed in this doctrine."

These contentions may be answered together.

■ We based our holding that the Communist Party advocates the forcible overthrow of this government on what we consider to be competent evidence, namely, Communist writings used by the Communist Party for

the purpose of indoctrinating its members. Further support for this conclusion is found in the testimony of the witness, Clark Harper, who, as an undercover agent for the F.B.I., was a member of the Communist Party in Seattle from October 1944 until June 1953, when he took the witness stand for the government to testify against Communist leaders in the state of Washington indicted for violation of the Smith Act. Harper became chairman of a club and finally a member of the district committee which was in charge of sections throughout the state of Washington. This witness testified from his knowledge and experience that the ultimate aim of the Communist Party is the violent overthrow of the government, and that the members of the Party were so instructed. This is the same Communist Party of which Patterson was a member during three of the nine years that Harper was a member, and the same party whose "top-hierarchy" was in New York City. It used the same literature which the evidence in the case before us shows was used by Patterson and his fellow Communists. During the time that Patterson was a section leader Oregon was part of a district which included Washington and Idaho. We have no reason to reject Harper's testimony. We think that the question of the ultimate aim of the Communist Party is one of fact, that it is susceptible of proof, and is established by evidence in this case.

It was otherwise in the *Schware* and *Konigsberg* cases. So far as the opinion of the Supreme Court of the United States in *Konigsberg* discloses, no evidence concerning the character and aims of the Communist Party was before the Supreme Court of California when it rendered its decision refusing Konigsberg admission to the bar. The Supreme Court of Cali-

fornia wrote no opinion. The opinion of the Supreme Court of New Mexico quotes testimony given by Schware himself before the New Mexico Board of Bar Examiners tending to show that the Communist Party was a subversive organization which took its orders from Russia even as against the interest of the United States. The Supreme Court of the United States, however, did not mention this testimony, but, as stated, said that the New Mexico court "assumed that in the 1930s when petitioner was a member of the Communist Party, it was dominated by a foreign power and was dedicated to the violent overthrow of the Government."

In *Schware* the Supreme Court of the United States emphasized the fact that in New Mexico during the time that Schware was a member "the Communist Party was a lawful political party with candidates on the ballot in most states." 353 US 244. In *Konigsberg* attention was called to the fact that in the year 1941, when it was claimed by the Bar Examiners that Konigsberg was a member, "the Communist Party was a recognized political party in the state of California. Citizens of that state were free to belong to that party if they wanted to do so. The state had not attempted to attach penalties of any kind to membership in the Communist Party. Its candidates' names were on the ballots California submitted to its voters."

In 1941 the legislature of this state enacted Oregon Laws 1941, ch 479 § 1, now ORS 236.030, which provides:

"(1) No person who is a member of, or affiliated with, any organization which teaches the doctrine of, or advocates, the overthrow of the Government of the United States by force or violence shall be a candidate for public office or eligible for appointment to a public office.

"(2) The name of a person defined in subsection (1) of this section shall not be placed upon any ballot in connection with any election."

██ We construe this section to apply only to persons who are members of an organization known to them to be of the character described in the statute. We know judicially that at least one of the organizations at which the statute was aimed is the Communist Party. Similar legislation is found in the state's Civil Service Act, Oregon Laws 1945, ch 400 § 14 (3), now ORS 240.340, and in the Civil Defense Act, Oregon Laws 1949, ch 434 § 14, amended by Oregon Laws 1955, ch 451 § 1, and now ORS 401.160.

The name of no candidate of the Communist Party has appeared on an Oregon ballot since 1940. Patterson was a member of the Communist Party from January 1946 until October 1949 when, as he claims, he was expelled.

Since 1940 legislation of the same general character has been adopted in 26 states and Hawaii. Digest of the Public Record of Communism in the United States published by The Fund for the Republic, Inc., (1955) 324-343. Federal legislation designed to restrict the activities and influence of the Communist Party is cited in our former opinion.

We refer to these matters now only for the purpose of pointing out that, if the question here was whether Patterson's membership in the Communist Party from 1946 to 1949 of itself was sufficient to disqualify him for admission to the bar, it could not be said in his behalf that during those years the Communist Party was a recognized political party in Oregon or in many other states of the union.

The question recurs: Did Patterson willfully swear to a falsehood when he denied under oath that the

Communist Party advocated the overthrow of the government of this country by force and violence and that he shared its aims, or, more precisely, is this court precluded by anything that was decided by the Supreme Court of the United States in Schware and Konigsberg from so finding?

We understand that the court has held in those cases that mere proof that a person was a member of the Communist Party does not afford a rational basis for a finding that such person shared the Party's illegal aims. While the court in Schware repeatedly referred to the period 1932-1940, when Schware was a member, and in Konigsberg to the year 1941 when Konigsberg was charged with being a member, we shall assume for present purposes that the court did not intend to limit its holding to those periods of time but would have said the same thing in the case of present membership in the Communist Party. See, however, *In re Anastaplo*, 3 Ill2d 471, 121 NE2d 826, appeal dismissed for want of a substantial federal question, cert. denied 348 US 946, 99 L ed 740, 75 S Ct 436.

The fact remains, however, that what the court dealt with in *Schware* and *Konigsberg* was *mere membership* in the Communist Party. There is more than that here; there is leadership. We know from the record that Patterson is able, well-educated and highly intelligent; we assume that he was what he claimed to be—a loyal member of the Communist Party who had been expelled without just cause. We are yet to be told that to find that such a man, who rose to the position in the Communist Party in Oregon attained by Patterson during the period 1946-1949, and who devoted so much of his energy and talents to the furtherance of its aims, was aware of its aims and

shared them, would be a mere arbitrary ukase. On the contrary, it seems to us that such a finding is but a reasonable inference to be drawn from established facts.

Counsel for the petitioner cite *Yates v. United States*, 354 US 298, 1 L ed 1356, 77 S Ct 1064, decided June 17, 1957, as opposed to this view. Yates was a criminal prosecution under the Smith Act in which the government was charged with the duty of establishing the guilt of the defendants beyond a reasonable doubt. Here the petitioner has the burden of showing by a preponderance of the evidence that he is of good moral character. We need not stop to write a definition of good moral character. It is enough to say that, if the petitioner testified falsely concerning the ultimate aims of the Communist Party, or if by evasion and dissembling he attempted to deceive respecting its true nature, he is lacking in fitness to be admitted to the bar and to become an officer of the court. This is no mere question of Patterson's opinion about the Communist Party. The inquiry is an objective one about the thing itself. Some facts about the Communist Party, as the late Mr. Justice Jackson said in his separate opinion in *American Communications Assn. v. Douds*, 339 US 382, 94 L ed 925, 70 S Ct 674, are "of general knowledge." This court takes judicial notice of facts of "general notoriety" (ORS 41.410); and, just as we took judicial notice of the great depression in *Marsh v. Arthur C. Marsh Co.*, 153 Or 134, 143, 55 P2d 1111, we take the like notice of the fact that during the years 1946-1949, when Patterson was a member of the Communist Party, it was a subversive organization which was on Russia's side in the "cold war" (as Patterson practically admitted in his testimony), and not, as he would have us believe, merely a political

party with a mission to make America, by the use of democratic processes, a more perfect democracy.

■ We believe that it is conceded on all sides that this court is vested with jurisdiction to determine who are qualified from the standpoint of learning, good moral character and fitness to be members of the bar of this state. We freely acknowledge that this is a power not to be exercised arbitrarily or capriciously, and that, where our action is challenged on constitutional grounds, what we do is subject to review by the Supreme Court of the United States and to be set aside where the challenge is sustained. But we assume that, if an applicant for admission to the bar should testify falsely upon any material issue other than Communism, we would be authorized to consider such false testimony as relevant to the issue of his moral character simply because the fact of falsehood is relevant per se. Why then should false testimony be less material to the issue of moral character when it relates to the nature and aims of the Communist Party? Our finding against the petitioner rests primarily on our belief that he testified falsely under oath. This is but an illustration of the common duty of courts to pass upon the credibility and thus the integrity of a party or witness.

In the present instance the Supreme Court has not held that the decision heretofore rendered by us did in fact violate the petitioner's constitutional rights, but only that this was a question for our reexamination in the light of the *Schware* and *Konigsberg* cases. The additional study we have given the case has been devoted solely to that issue, and has brought us to the conclusion that those decisions are not controlling here. We therefore adhere to our former opinion.