Argued June 29, petition denied October 10, 1956,
petition for rehearing denied December 11, 1956, mandate U. S.
Supreme Court, remanded for further consideration,
June 17, 1957

IN THE MATTER OF THE APPLICATION OF
# FRANK VICTOR PATTERSON
FOR ADMISSION TO THE BAR
302 P. 2d 227

*Leo Levenson* and *Nels Peterson,* Portland, argued
the cause and filed a brief for petitioner.

*Alan F. Davis,* Portland, argued the cause and filed
a brief for the Oregon State Bar.

Before WARNER, Chief Justice, and TOOZE, LUSK,
BRAND, LATOURETTE[*] and PERRY, Justices.

LUSK, J.

The petitioner, Frank Victor Patterson, wrote and

[*] Died August 18, 1956.

passed the 1953 Oregon bar examination. The Board of Bar Examiners, after investigation and a hearing at which the petitioner appeared and was represented by counsel, recommended that he be not admitted to the bar because in their judgment he did not possess the requisite qualifications of character to entitle him to that privilege. This court followed the recommendation and refused the petitioner admission. Thereafter petitioner sought and was granted a hearing in this court. We referred the case to a panel of three circuit judges, the Honorable Arlie G. Walker, the Honorable William G. East, and the Honorable Rex Kimmell, to take testimony and report their findings to this court. (The procedure adopted was a departure from that prescribed in Rule E of our Rules for Admission of Attorneys, but objection thereto was expressly waived by petitioner.) Judge Kimmell died May 10, 1954. On July 26, 1954, Judges Walker and East made their report to this court finding against the petitioner, and the matter was thereafter argued here orally and on briefs upon the Oregon State Bar's motion to affirm the report of the panel.

The question of petitioner's fitness to be a member of the bar arises out of his former affiliation with the Communist Party of the United States of America. According to his testimony he was expelled from the Party in 1949 for disloyalty. It is not claimed by the bar that such former membership in the Party in and of itself is sufficient ground for refusing admission to practice. But it is objected that on April 3, 1953, he falsely answered "yes" to the following question in his sworn application to take the bar examintion: "Do you believe in the principles underlying the form of government of the United States?"; that on June 30, 1949, he wilfully withheld the information

that he was at that time a Communist from the authorities of Northwestern College of Law in his application for admission to that school; that he falsely testified both before the Board of Bar Examiners and the panel as to his knowledge of the teachings, aims and purposes of the Communist Party and his belief in and advocacy thereof; that he falsely testified that he was expelled from the Party; that he failed to cooperate with the F.B.I. when asked to give information about the Party; and that he refused to answer questions as to his membership in the Party and his knowledge regarding it when called as a witness by the House Unamerican Activities Committee (the so-called Velde Committee), at a hearing in Portland, on the grounds that the questions were an invasion of his rights under the First, Fourth, Fifth, Ninth and Tenth Amendments of the Constitution of the United States. This last incident occurred after the conclusion of the hearing before the panel of circuit judges, but prior to submission of the case to this court.

The petitioner was born in Seattle, Washington, on March 17, 1917, and was educated in the public schools of that state and at the University of Washington, where he received the degree of bachelor of arts in sociology in 1939, and was a graduate student for a year thereafter. Until the autumn of 1949 when he enrolled as a student at Northwestern College of Law, an evening law school in Portland, his activities included employment under the United States Department of Agriculture; 15 months service in the Army from which he was honorably discharged on September 9, 1943; organizer for a labor union; social worker for the American Red Cross; and administrative sec-

retary and organizer for the Progressive Party of America from April 1948 to July 1949.

Petitioner's interest in Communism appears to have been first awakened at the University of Washington where the works of Marx, Engels, Lenin and other Communist writers, and articles in such periodicals as the Communist publication, "New Masses," were required reading in his course. This interest seems to have been accelerated by his observation of conditions among the unemployed and among the negro people of the South while he was engaged in work connected with labor camps as an employee of the Department of Agriculture, and, in general, by what seemed to him to be the unequal distribution of wealth in this country. He joined the Party in January 1946 as a secret member. His reasons for becoming a secret member, as stated by him in his testimony, were, first, that a person's politics are his own business, and, second, that anyone who belongs to an organization which carries on a campaign for "socialism" will find it difficult to keep a job, while his family and friends will be ostracized. He was chairman of the Communist "Hal Spring Club" or cell in Portland, which had nine or ten members, and advanced in the Party to membership on the Oregon State Board; section leader when Oregon was part of a district which included Washington and Idaho; and finally, when Oregon was made a separate district, to membership on the District Board for this state. He attended a conference of the Party in Seattle in 1948. There is no question about the fact that he was a leader and an active one in the Communist Party in Oregon for a period of nearly four years.

In September 1949 petitioner enrolled as a student at Northwestern College of Law. He was an out-

standing student. On October 14, 1949, in the case of *United States v. Dennis,* the famous Communist trial which had commenced some nine months earlier, the jury brought in a verdict against all the defendants. See 183 F2d 201, 206. Shortly thereafter the petitioner was, as he testified, expelled from the Party as an informer. Contrary to the right given in the Constitution of the Party, he was refused a hearing. Petitioner testified that at a meeting of the State Board, of which he was a member, he was informed of his expulsion; that he "got very angry about it" and "raised various questions as to the evidence, or the proof," but was told that the State Committee had already voted to expel him and that "they couldn't afford the luxury of a trial because of the fact that * * * leading people had turned out in various places to be informers"; that "there was terror running through the organization when those eleven were convicted." Petitioner further testified that before he was expelled from the Party he had never conceived the idea of terminating his relationship with it.

At club meetings, which were held twice a month, they collected dues, sold literature, discussed current events or a book or article in a periodical, and received reports from people with particular problems. The purpose of the meetings was to gain an understanding of the principles of Marxism and Leninism, "among many." A Communist was required to belong to a trade union if he was eligible and worked in the industry. Communists were encouraged to go to work in factories, in basic industries. Effort was made to recruit negroes and to organize groups to promote legislation opposing racial discrimination. The party had a "top-hierarchy" in New York City, various districts throughout the United States, a state chair-

man or organizer for each district, and in each district clubs. He had never seen any Party orders or instructions except as articles in the magazine "Political Affairs" might be deemed Party orders or instructions, but conceded that the Oregon District of the Party was subject to the orders and control of the National Party to a great extent. Efforts were made to recruit new members all the time, and the method was usually by personal contact. Not everyone would be taken into the Party, but it was the policy to keep out informers or people who did not join with sincerity in working for socialism and in supporting the issues which the Party was supporting. He denied that he had "infiltrated" himself into the Progressive Party, but admitted that at the time he was a member and executive secretary of that Party, none of the other state leaders knew that he was a Communist. Prior to the time when the information came to the attention of the Oregon State Bar, he had never told anyone connected with the legal profession of his membership in the Party except Irvin Goodman, an attorney. That was in 1947. He discussed with Mr. Goodman at that time the possibility of his going to law school and becoming a member of the Bar.

There were received in evidence the following Communist publications: "History of the Communist Party of the Soviet Union" edited by a Commission of the Central Committee of the C.P.S.U. (B.) and authorized by the Central Committee of the C.P.S.U. (B.), published by International Publishers, New York, 1939; the "Communist Manifesto" by Karl Marx and Friedrich Engels, published by International Publishers, New York, 1939; "State and Revolution" by V. I. Lenin, published by International Publishers, New York, 1935; and "Strategy and Tactics of the Pro-

letarian Revolution'' published by International Publishers, New York, 1936. The first three, according to the testimony of the petitioner, were basic reading for members of the Party; at club meetings they were read, studied and discussed. Petitioner testified that he did not believe, while he was in the Party nor at the time his testimony was given (March 1954) that the Party advocated the overthrow of the United States government by force and violence, or that that was one of its ultimate aims. He believed that socialism could be achieved in America by democratic means and without alteration of the fundamentals of our constitutional system. Attachment to the Constitution did not require adherence to a particular economic or financial design for our country. He sought only economic changes, not changes in ''our democratic forms.'' The socialism aimed at was not the form prevailing in Russia but ''A form of socialism which takes into consideration the type of country we have, its industrial capacity, its people, its geographical area, the traditions of the people, and the particular needs for getting the most, the best possible distribution and production.'' He was emphatically opposed to the forcible overthrow of the government. He developed in a prepared statement, which he was permitted to read and which is much too long even to summarize here, his political and economic philosophy, insisting that, as he understood it, when he was a member of the Party ''Capitalism was not the issue, but preservation of democratic principles of government and democratic laws and legislation was. Therefore, it was far more important to elect public officials dedicated to preservation of the Constitution and opposed to trends in the direction of fascism, than it was to run Communists, or even to elect them.'' ''How-

ever," he added, "the Communists would take what opportunity they could to explain that in the long run, socialism was the only cure to inequality." With reference to particular issues which have engrossed the attention of the American people during the past 10 years or more he followed, as one might say, "the party line." He was "shocked" by the prosecution of the 12 Communists for violation of the Smith Act, and thought that the Act should be repealed or substantially amended, see *Dennis v. United States,* 341 US 494, 95 L ed 1137, 71 S Ct 857 (1951); "shocked" by Judge Medina's sentencing to jail for contempt of court some of the attorneys for the defendants in that case; and by the similar action of Judge Harris in San Francisco in the case of Vincent Hallinan, who was candidate for vice president of the United States on the Progressive Party ticket. He thought Alger Hiss was probably innocent, and suspected the motives of such people as Whitaker Chambers. He considered that the Communists came to power in China through civil war, and he was not prepared to admit that it was with the help of Russia. And he expressed the opinion that both China and the United States should be blamed for getting into the "civil war" in Korea.

He admitted that "probably some" Communist writings say that "to change the economic structure of the United States would necessarily be to change the political structure." The following from the last paragraph of the "Communist Manifesto" was read to him, and he was asked to give his understanding of its meaning: "The communists disdain to conceal their views and aims. They openly declare that their ends can be attained only by the forcible overthrow of all existing social conditions." He answered, "I

would say that at that time, Marx said the working men can only achieve their goals by the forcible overthrow of existing governments'' (he evidently referred to the date of publication of the Manifesto, which was 1848), and that later Marx said that ''it was likely that force would not be needed to establish socialism in the Netherlands, Great Britain and the United States.'' He considered Communist writings to be a deep and difficult study and there were a number of things he didn't understand. The ''crux question,'' petitioner said, was ''that they advocate the overthrow of the Government by force and violence'' and ''I think that they did not and do not.'' One of the judges then asked this question: ''Then with you, there isn't any problem about Communism at the present time—is that correct?'' He answered: ''Except insofar as certain internal matters, which are probably not illegal from the standpoint—probably should not be the cause for them to be outlawed, but would be my particular reasons for not rejoining.'' He did not explain the nature of these ''internal matters.'' He gave as reasons for not rejoining the Party that it was contrary to the wishes of his wife, mother and friends, and his family's needs; that membership was tantamount now to membership in an illegal or outlawed party; and that, while the Party was not under control of a foreign power directly, he would not be a member of a group which, innocently or otherwise, feels it has to justify everything the Soviet Union does. He said:

> '' * * * Suppose one believed that everything has been done properly in the Soviet Union, then along comes the Soviet Union and tells the world that one of its principal figures, Beria, has been wrong all these years—he was head of the secret police, and maybe of the international—the inter-

national affairs—that must be rather embarrassing to anyone who has contended all along that all Soviet leaders have been O.K."

Beria, it will be recalled, was liquidated on December 23, 1953. The petitioner might, had he had the gift of prophecy, have offered the same illustration about Stalin, whose denigration did not take place until after March 1954 when the hearing was held.

We append to this opinion excerpts from "State and Revolution," which, as stated, was acknowledged by petitioner to be basic reading when he was a member of the Party. The excerpts are the same as those which Chief Justice Stone included in the appendix to his dissenting opinion, concurred in by Justices Roberts and Frankfurter, in *Schneiderman v. United States*, 320 US 118, 195, 87 L ed 1796, 63 S Ct 1333 (1943). They were chosen by the Chief Justice, along with passages from "Statutes, Theses and Conditions of Admission to the Communist International" (a Communist publication not in evidence here), "not because they prove more than others but only because they express in short form ideas which permeate all." 320 US 195.

Since the Schneiderman decision (of which more later) the true character of the Communist Party of the United States of America has clearly emerged, has been declared by court decisions and in Acts of Congress, and is no longer open to question in the minds of reasonable men in this country.

In *United States v. Dennis*, supra, affirming the conviction of 11 officials of the Communist Party of the United States charged with conspiracy to organize the Party as a group to "teach and advocate the overthrow and destruction" of the government "by force

and violence" and "knowingly and wilfully to advocate and teach the duty and necessity of overthrowing and destroying" the government "by force and violence," Judge Learned Hand, writing the opinion for the court, summed up the doctrines of Marxism-Leninism, and said among other things:

> " * * * These doctrines were set forth in many pamphlets put in evidence at the trial, the upshot of which is—indeed an honest jury could scarcely have found otherwise—that capitalism inescapably rests upon, and must perpetuate, the oppression of those who do not own the means of production; that to it in time there must and will succeed a 'classless' society, which will finally make unnecessary most of the paraphernalia of government; but that there must be an intermediate and transitional period of the 'dictatorship of the proletariat,' which can be established only by the violent overthrow of any existing government, if that be capitalistic." 183 F2d 206.

In the same case, when it reached the United States Supreme Court *sub nom Dennis v. United States,* supra, Mr. Justice Jackson, in his concurring opinion, said of Communism:

> " * * * From time to time it champions all manner of causes and grievances and makes alliances that may add to its foothold in government or embarrass the authorities.

> "The Communist Party, nevertheless, does not seek its strength primarily in numbers. Its aim is a relatively small party whose strength is in selected, dedicated, indoctrinated, and rigidly disciplined members. From established policy it tolerates no deviation and no debate. It seeks members that are, or may be, secreted in strategic posts in transportation, communications, industry, government, and especially in labor unions where it can compel employers to accept and retain its members. It also seeks to infiltrate and control organ-

izations of professional and other groups. Through these placements in positions of power it seeks a leverage over society that will make up in power of coercion what it lacks in power of persuasion.

"The Communists have no scruples against sabotage, terrorism, assassination, or mob disorder; but violence is not with them, as with the anarchists, an end in itself. The Communist Party advocates force only when prudent and profitable. Their strategy of stealth precludes premature or uncoordinated outbursts of violence, except, of course, when the blame will be placed on shoulders other than their own. They resort to violence as to truth, not as a principle but as an expedient. Force or violence, as they would resort to it, may never be necessary, because infiltration and deception may be enough.

"Force would be utilized by the Communist Party not to destroy government but for its capture. The Communist recognizes that an established government in control of modern technology cannot be overthrown by force until it is about ready to fall of its own weight. Concerted uprising, therefore, is to await that contingency and revolution is seen, not as a sudden episode, but as the consummation of a long process."

Before that Mr. Justice Jackson had written at greater length upon this subject in his concurring opinion in *American Communications Association v. Douds,* 339 US 382, 94 L ed 925, 70 S Ct 674 (1950), which sustained the constitutionality of the non-Communist affidavit provision of the Labor Management Act of June 2, 1947. 29 USCA §§ 151 et seq. Mr. Justice Jackson said that "From information before its several Committees and from facts of general knowledge, Congress could rationally conclude that, behind its political party facade, the Communist Party is a conspiratorial and revolutionary junta, organized to reach ends and to use methods which are incompatible with our con-

stitutional system." He followed with a statement of the important conclusions which Congress was permitted to draw as to "the distinguishing characteristics" of the Party. These are as follows:

"1. The goal of the Communist Party is to seize powers of government by and for a minority rather than to acquire power through the vote of a free electorate." 339 US 425.

"2. The Communist Party alone among American parties past or present is dominated and controlled by a foreign government." Id. 427.

"3. Violent and undemocratic means are the calculated and indispensable methods to attain the Communist Party's goal." Id. 429.

"4. The Communist Party has sought to gain this leverage and hold on the American population by acquiring control of the labor movement." Id 430.

"5. Every member of the Communist Party is an agent to execute the Communist program." Id. 431.

Justice Jackson's elaboration of these five propositions, which is too long to be included here, might be read with profit by every American.

In 1950 Congress passed the Internal Security Act (50 USCA, ch 23), and in 1954 the Communist Control Act (50 USCA '55 P P §§ 841-844), which proscribed the Communist Party of America. Both contain congressional findings to the effect that the Party is a subversive organization dedicated to the overthrow of this government by force and violence. These, together with a section of the later act outlawing the Party, are set forth in the appendix.

In our consideration of this case we put to one side the bar's contentions that the petitioner was guilty of deception in failing to state, in answer to a some-

what ambiguous question in his application for admission to Northwestern College of Law, that he was a member of the Communist Party; that his refusal to cooperate with agents of the F.B.I. in their efforts to obtain information about Communism, and his invoking the Fifth and other amendments when called as a witness before the Velde Committee, constituted evidence of bad character; and that he was guilty of perjury in swearing that he believed in the principles underlying the form of government of the United States in his application to take the bar examination. Further, we find that there is no evidence to support the bar's charge that petitioner falsely swore that he was expelled from the Communist Party.

Our concern is with the question whether the petitioner was untruthful in his testimony, both before the Board of Bar Examiners and the panel of circuit judges, that the Party did not teach and advocate the overthrow of this government by force and violence, and that he, as a member of the Party, did not believe in that doctrine. As we have already indicated, the proof establishes that this is one of the ultimate aims of the Party. The acts of Congress to which we have referred are relevant upon this question, for, while they were not passed until after the petitioner's expulsion from the Party, their recitals obviously do not describe an organization which has suddenly taken on the character attributed to it by Congress. There is nothing in "State and Revolution" beyond the understanding of a man having the education and superior intelligence of the petitioner. "The replacement," wrote Lenin, "of the bourgeoisie by the proletarian state is impossible without a violent revolution." "State and Revolution," p 20. He proclaimed "The doctrine of the class struggle" which leads in-

evitably to the dictatorship of the proletariat, i.e., "of a power shared with none and relying directly upon the armed force of the masses." Id. 23. Of England and America he wrote that in 1917 they had "plunged headlong into the all-European dirty, bloody morass of military bureaucratic institutions to which everything is subordinated and which trample everything under foot," and that in those countries "the 'precondition of any real people's revolution' is the *break-up,* the *shattering* of the 'ready-made state machinery' (brought in those countries, between 1914 and 1917, to general 'European' imperialist perfection)." Id. 34. And, lest there be any doubt about the meaning of the word "revolution," Lenin quoted from Engels as follows:

> " * * * Revolution is undoubtedly the most authoritative thing possible. It is an act in which one section of the population imposes its will on the other by means of rifles, bayonets, cannon, *i.e.,* by highly authoritative means, and the victorious party is inevitably forced to maintain its supremacy by means of that fear which its arms inspire in the reactionaries." Id. 53.

The Communist Party during the years 1946 to 1949 was not, as it is not today, "just another political party," and we cannot accept petitioner's protestations that all it sought was the establishment of a system of socialism within the framework of our constitutional form of government, and that it was dedicated only to "the preservation of democratic principles of government and democratic laws and legislation" and the election of "public officials dedicated to the preservation of the Constitution." Nor are we persuaded that the petitioner did not understand or believe in the gospel which, as an active member and high officer of the Party in Oregon, he

helped to disseminate. Here the words of Chief Justice Stone in his dissenting opinion in the Schneiderman case are peculiarly appropriate:

"* * * It is possible, though not probable or normal, for one to be attached to principles diametrically opposed to those, to the dissemination of which he has given his life's best effort. But it is a normal and sensible inference which the trier of fact is free to make that his attachment is to those principles rather than to constitutional principles with which they are at war. A man can be known by the ideas he spreads as well as by the company he keeps." 320 US 197.

Similar is the statement of Chief Justice Vinson, speaking for the court in *American Communications Association v. Douds,* supra, 339 US 411: "while objective facts may be proved directly, the state of a man's mind must be inferred from the things he says or does."

This is not the case of a reformed Communist—far from it. The petitioner disapproves of reformed Communists. He was angry because he was expelled from the Party. In all his testimony he expressed no regret over having been a member of the Party, and found little fault with it save a somewhat mild objection to its policy of applauding everything the Soviet Union did. Whether a lingering attachment to it influenced his steady refusal to admit the truth, is a matter of speculation. Whatever may have been the impelling motive, he did not, in our opinion, tell the truth, either to the Board of Bar Examiners or in his testimony before the panel of judges, about the real character and the aims of the Communist Party and his belief in them. That alone is sufficient to support the finding that he is not, within the mean-

ing of our statute, "a person of good moral character" (ORS 9.220 (2) ), and as such entitled to admission as attorney.

No question is here presented of freedom of speech or of opinion. Petitioner is perfectly free to express views diametrically opposed to those generally held about the Smith Act and the conviction of Communists for violating it, the guilt or innocence of Alger Hiss, and kindred subjects. The privilege of admission to the bar would never be denied him on that account. It is denied him for the reasons hereinabove given and for no other.

We have referred more than once to *Schneiderman v. United States,* which was relied on by the petitioner in his testimony and has been cited by counsel in argument. The case was a denaturalization proceeding, and the court held that the government had failed to sustain the burden of proving by "clear, unequivocal, and convincing evidence" that Schneiderman had obtained his citizenship illegally. The proof was that for many years, including the five-year period immediately preceding his naturalization (1922 to 1927) Schneiderman had been an active member of the Communist Party. The character of the Party, as to whether it advocated the overthrow of the government by force and violence, was a principal question in the case, and the majority of the court thought that it was "a tenable conclusion" that the Party, during the time in question, desired to achieve its purpose by peaceful and democratic means. A sufficient point of distinction between that case and this is that in the former the burden of proof was on the government and it was a very heavy burden, whereas here, as counsel for the petitioner expressly concede, the burden of proof lies with the petitioner. ORS

9.220 (2). That a part, we venture to express doubt as to whether, in the light of what has transpired relative to the Communist Party of the United States since the Schneiderman case was decided in 1943, such a decision would again be rendered. Illuminating comments on the decision may be found in *Martin v. Law Society of British Columbia,* 3 Dominion L Rep 173, 181 (1950) ; The Schneiderman Case—Its Political Aspects, 12 Fordham L Rev 209; The Schneiderman Case —Some Legal Aspects, 12 Fordham L Rev 231.

The following from the very able opinion of Mr. Justice O'Halloran in *Martin v. Law Society of British Columbia,* supra (where a Communist was denied admission to the bar), is pertinent upon the question which we have here considered:

> "But the facts before this Court and the known conditions existing today do not permit us to take the neutral and detached view of Communism which the majority of the United States Supreme Court, as it was constituted between 1937-1947, persuaded themselves to adopt in the *Schneiderman, Bridges* and other decisions. We are compelled today to take a more informed view of Communist ideology and practice than was generally prevalent in Canada and the United States prior to 1946. Up to that time, it was very difficult for people educated in Canada or the United States to realize the true extent of the influence of Marxist philosophy upon what was happening not alone in Europe, but right here at home on the North American continent."

This is a very grave case, and the court is fully aware of the consequences of its decision to the petitioner. It is also keenly conscious of its duty to protect the public interest when exercising its authority to admit or deny admission to the bar. As we are not convinced that in point of character the petitioner

is a fit person to be licensed to practice law, we think that it would be contrary to the public interest were he to be granted that privilege.

The report of the panel of circuit judges is affirmed, and the petitioner's application to be admitted as an attorney is denied.

## APPENDIX

Excerpts from "State and Revolution:

"We have already said above and shall show more fully later that the teaching of Marx and Engels regarding the inevitability of a violent revolution refers to the bourgeois state. It *cannot* be replaced by the proletarian state (the dictatorship of the proletariat) through 'withering away,' but, as a general rule, only through a violent revolution. The panegyric sung in its honour by Engels and fully corresponding to the repeated declarations of Marx (remember the concluding passages of the *Poverty of Philosophy* and the *Communist Manifesto,* with its proud and open declaration of the inevitability of a violent revolution; remember Marx's *Critique of the Gotha Programme* of 1875 in which, almost thirty years later, he mercilessly castigates the opportunist character of that programme) — this praise is by no means a mere 'impulse,' a mere declamation, or a polemical sally. The necessity of systematically fostering among the masses *this* and just this point of view about violent revolution lies at the root of the *whole* of Marx's and Engels' teaching. The neglect of such propaganda and agitation by both the present predominant social-chauvinist and the Kautskyist currents brings their betrayal of Marx's and Engels' teaching into prominent relief.

"The replacement of the bourgeois by the proletarian state is impossible without a violent revolution. The abolition of the proletarian state, *i.e.,* of all states, is only possible through 'withering away.' " (Pp 19, 20)

"The state is a special organisation of force; it is the organisation of violence for the suppression of some class. What class must the proletariat suppress? Naturally, the exploiting class only, *i.e.,* the bourgeoisie. The toilers need the state only to overcome the resistance of the exploiters, and only the proletariat can direct this suppression and bring it to fulfillment, for the proletariat is the only class that is thoroughly revolutionary, the only class that can unite all the toilers and the exploited in the struggle against the bourgeoisie, in completly displacing it." (P 22)

"The doctrine of the class struggle, as applied by Marx to the question of the state and of the Socialist revolution, leads inevitably to the recognition of the *political rule* of the proletariat, of its dictatorship, *i.e.,* of a power shared with none and relying directly upon the armed force of the masses. The overthrow of the bourgeoisie is realisable only by the transformation of the proletariat into the *ruling class,* able to crush the inevitable and desperate resistance of the bourgeoisie, and to organise, for the new economic order, *all* the toiling and exploited masses.

"The proletariat needs state power, the centralised organisation of force, the organisation of violence, both for the purpose of crushing the resistance of the exploiters and for the purpose of *guiding* the great mass of the population—the peasantry, the petty-bourgeoisie, the semi-proletarians—in the work of organising Socialist economy." (P 23)

"But, if the proletariat needs the state, as a *special*

form of organisation of violence *against* the capitalist class, the following question arises almost automatically: is it thinkable that such an organisation can be created without a preliminary break-up and destruction of the state machinery created for *its own* use by the bourgeoisie? The *Communist Manifesto* leads straight to this conclusion, and it is of this conclusion that Marx speaks when summing up the experience of the revolution of 1848-1851.'' (P 24)

'' * * * Hence Marx excluded England, where a revolution, even a people's revolution, could be imagined, and was then possible, *without* the preliminary condition of destroying the 'ready-made state machinery.'

''Today, in 1917, in the epoch of the first great imperialist war, this exception made by Marx is no longer valid. Both England and America, the greatest and last representatives of Anglo-Saxon 'liberty' in the sense of the absence of militarism and bureaucracy, have today plunged headlong into the all-European dirty, bloody morass of military bureaucratic institutions to which everything is subordinated and which trample everything under foot. Today, both in England and in America, the 'precondition of any real people's revolution' is the *break-up*, the *shattering* of the 'ready-made state machinery' (brought in those countries, between 1914 and 1917, to general 'European' imperialist perfection).'' (P 34)

'' * * * Revolution is undoubtedly the most authoritative thing possible. It is an act in which one section of the population imposes its will on the other by means of rifles, bayonets, cannon, *i.e.,* by highly authoritative means, and the victorious party is inevitably forced to maintain its supremacy by means

of that fear which its arms inspire in the reactionaries.'' (P 53)

''But from this capitalist democracy—inevitably narrow, subtly rejecting the poor, and therefore hypocritical and false to the core—progress does not march onward, simply, smoothly and directly, to 'greater and greater democracy,' as the liberal professors and petty-bourgeois opportunists would have us believe. No, progress marches onward, *i.e.,* towards Communism, through the dictatorship of the proletariat; it cannot do otherwise, for there is no one else and no other way to *break the resistance* of the capitalist exploiters.

''But the dictatorship of the proletariat—*i.e.,* the organisation of the vanguard of the oppressed as the ruling class for the purpose of crushing the oppressors —cannot produce merely an expansion of democracy. *Together* with an immense expansion of democracy which *for the first time* becomes democracy for the poor, democracy for the people, and not democracy for the rich folk, the dictatorship of the proletariat produces a series of restrictions of liberty in the case of the oppressors, the exploiters, the capitalists. We must crush them in order to free humanity from wage-slavery; their resistance must be broken by force; it is clear that where there is suppression there is also violence, there is no liberty, no democracy.

''Engels expressed this splendidly in his letter to Bebel when he said, as the reader will remember, that 'as long as the proletariat still *needs* the state, it needs it not in the interests of freedom, but for the purpose of crushing its antagonists; and as soon as it becomes possible to speak of freedom, then the state, as such, ceases to exist.'

''Democracy for the vast majority of the people, and suppression by force, *i.e.,* exclusion from democ-

racy, of the exploiters and oppressors of the people —this is the modification of democracy during the *transition* from capitalism to Communism.'' (P 73)

''Again, during the *transition* from capitalism to Communism, suppression is *still* necessary; but it is the suppression of the minority of exploiters by the majority of exploited. A special apparatus, special machinery for suppression, the 'state,' is *still* necessary, but this is now a transitional state, no longer a state in the usual sense, for the suppression of the minority of exploiters, by the majority of the wage slaves *of yesterday,* is a matter comparatively so easy, simple and natural that it will cost far less bloodshed than the suppression of the risings of slaves, serfs or wage labourers, and will cost mankind far less.'' (P 74)

Internal Security Act of 1950, 50 USCA § 781 (15):

''The Communist movement in the United States is an organization numbering thousands of adherents, rigidly and ruthlessly disciplined. Awaiting and seeking to advance a moment when the United States may be so far extended by foreign engagements, so far divided in counsel, or so far in industrial or financial straits, that overthrow of the Government of the United States by force and violence may seem possible of achievement, it seeks converts far and wide by an extensive system of schooling and indoctrination. Such preparations by Communist organizations in other countries have aided in supplanting existing governments. The Communist organization in the United States, pursuing its stated objectives, the recent successes of Communist methods in other countries, and the nature and control of the world Communist movement itself, present a clear and present danger to the security of the United States and to the existence of

free American institutions, and make it necessary that Congress, in order to provide for the common defense, to preserve the sovereignty of the United States as an independent nation, and to guarantee to each State a republican form of government, enact appropriate legislation recognizing the existence of such world-wide conspiracy and designed to prevent it from accomplishing its purpose in the United States.''

Communist Control Act of 1954, 50 USCA '55 PP §§ 841, 842:

''The Congress finds and declares that the Communist Party of the United States, although purportedly a political party, is in fact an instrumentality of a conspiracy to overthrow the Government of the United States.  It constitutes an authoritarian dictatorship within a republic, demanding for itself the rights and privileges accorded to political parties, but denying to all others the liberties guaranteed by the Constitution.  Unlike political parties, which evolve their policies and programs through public means, by the reconciliation of a wide variety of individual views, and submit those policies and programs to the electorate at large for approval or disapprovel, the policies and programs of the Communist Party are secretly prescribed for it by the foreign leaders of the world Communist movement.  Its members have no part in determining its goals, and are not permitted to voice dissent to party objectives. Unlike members of political parties, members of the Communist Party are recruited for indoctrination with respect to its objectives and methods, and are organized, instructed, and disciplined to carry into action slavishly the assignments given them by their hierarchical chieftains.  Unlike political parties, the Communist Party acknowledges no constitutional or statutory limitations upon its conduct

or upon that of its members. The Communist Party is relatively small numerically, and gives scant indication of capacity ever to attain its ends by lawful political means. The peril inherent in its operation arises not from its numbers, but from its failure to acknowledge any limitation as to the nature of its activities, and its dedication to the proposition that the present constitutional Government of the United States ultimately must be brought to ruin by any available means, including resort to force and violence. Holding that doctrine, its role as the agency of a hostile foreign power renders its existence a clear present and continuing danger to the security of the United States. It is the means whereby individuals are seduced into the service of the world Communist movement, trained to do its bidding, and directed and controlled in the conspiratorial performance of their revolutionary services. Therefore, the Communist Party should be outlawed.

"The Communist Party of the United States, or any successors of such party regardless of the assumed name, whose object or purpose is to overthrow the Government of the United States, or the government of any State, Territory, District, or possession thereof, or the government of any political subdivision therein by force and violence, are not entitled to any of the rights, privileges, and immunities attendant upon legal bodies created under the jurisdiction of the laws of the United States or any political subdivision thereof; and whatever rights, privileges, and immunities which have heretofore been granted to said party or any subsidiary organization by reason of the laws of the United States or any political subdivision thereof, are terminated."